STATE OF TEXAS V. MARY C. RUSSELL ET AL.

Decided January 18, 1905.

**1.—Treaty—Legislative and Judicial Power.**

The duty of providing for the recognition of inchoate and merely equitable rights, protected by treaty, rests with the political branch of government, and actions for their enforcement by the courts must be brought within the terms of the act by which that department has delegated to the judiciary authority to adjudicate such claims.

**2.—Mexican Grant—Confirmation of Title—Statute.**

The Act of September 3, 1901, providing for the confirmation of Spanish and Mexican titles, is not limited in its operation to legal titles by completed grants, but authorized the adjudication of and confirmation of equitable inchoate titles issued by the government of the State of Tamaulipas, in which, the proceedings for acquiring the title being regular in other respects, the grant by the Governor of Tamaulipas was not issued till March 25, 1836 (independence having been declared on March 2), and the final act of placing the grantee in juridical possession completed on April 17, 1836.

**3.—Independence—Territorial Limits.**

At the date of its declaration of independence (March 2, 1836) Texas did not assert jurisdiction over lands between the Nueces and Rio Grande embraced within the limits of the State of Tamaulipas; and the regularity, as complete legal title, of grants of such land, made by the State of Tamaulipas after that date, and before Texas claimed jurisdiction over such territory, was not affected by the independence of Texas.

**4.—Grant by Tamaulipas—Treaty—Statute.**

A grant by the State of Tamaulipas of title to land then within its limits, now in Hidalgo County, Texas, completed by placing the grantee in juridical possession on April 17, 1836, whether regarded as an inchoate and equitable title or a complete legal one, was included within the "legitimate titles" protected by such treaty and the subsequent protocol explaining the suppression of its tenth article, and was within the protection of the terms of the treaty of Guadalupe Hidalgo, and of the Act of September 3, 1901, for adjudicating such titles.

**5.—Same.**

The protocol, supplementary to the treaty of Guadalupe Hidalgo, if referring only to complete legal titles by the terms "legitimate titles . . . in Texas up to the 2d day of March, 1836," did not exclude from protection titles subsequently made complete in the State of Tamaulipas, since that was not a title "in Texas" at the date named.

**6.—Boundary—Calls.**

Calls for an established line of a previous survey as a boundary are held to prevail in this case over those for course and distance, though resulting in a large excess in the survey.

Appeal from the District Court of Travis County. Tried below before Hon. V. L. Brooks.

*R. V. Davidson,* Attorney General, and *T. S. Reese,* Assistant, for appellant.—A purported grant of land made after the 2d day of March, 1836, within the present territorial limits of the State of Texas by the authorities of the State of Tamaulipas is an absolute nullity. Coffee v. Groover, 123 U. S., 1; Board of Ld. Com. of M. C. v. Bell, Dallam, 368; Trimble v. Smithers, 1 Texas, 789; Houston v. Robertson, 2 Texas, 16;

League v. De Young, 2 Texas, 500; Norton's Succession v. Land Commissioners, 2 Texas, 358; Kemper v. Victoria, 3 Texas, 138; Jones v. Borden, 5 Texas, 412; McMullen v. Hodge, 5 Texas, 77.

The boundary of a grant will be located by a call for course and distance in the absence of evidence showing that it extended to a natural object or a marked line beyond the line as it would be located by course and distance. Stafford v. King, 30 Texas, 273; Booth v. Strippleman, 26 Texas, 440; Booth v. Upshur, 26 Texas, 64; Sanborn v. Gunter & Munson, 84 Texas, 298; Bigham v. McDowell, 69 Texas, 102; Ayers v. Watson, 113 U. S., 606.

*J. B. Wells, J. C. Sullivan* and *G. R. Scott,* for appellee.—A grant of land by the authorities of the State of Tamaulipas, Mexico, at any time after the independence of Mexico and prior to the 19th of December, 1836, for lands situated between the Nueces and Rio Grande Rivers and below a line drawn from the northern boundary of Webb County, Texas, to the mouth of Moros creek where the same empties into the Nueces River, is a good and valid grant and vested in the grantee a good and perfect title to the lands so granted. Sayles' Real Estate Laws of Texas, vol. 1, sec. 155; State v. Bustamente, 47 Texas, 320; State v. Cardinas, 47 Texas, 250; State v. Cuellar, 47 Texas, 295; State v. Sais, 60 Texas, 87; State v. De Leon, 64 Texas, 553.

Prior to the time of the adoption of the treaty of Guadalupe Hidalgo, Juan Garza Diez and Pedro Garcia Trevino, Mexican citizens, and those holding under them, had acquired a property right founded in justice and good faith and based upon authority competent to its creation in the two grants of land involved in this suit, which property right was protected by said treaty. Mitchell v. United States, 9 Peters, 711; Strother v. Lucas, 12 Peters, 410; United States v. Reynes, 9 Howard, 127.

A call for an unmarked line in the prairie will control a call for course and distance. Stafford v. King, 30 Texas, 269-274; Maddox Bros. v. Fenner, 79 Texas, 290, 292.

FISHER, CHIEF JUSTICE.—This is a suit in the nature of trespass to try title, brought by the State under the Act of the Legislature, approved September 3, 1901, for the title and possession of a certain tract of land situated in Hidalgo County, Texas, and containing about 41,847 acres. The petition is in the usual form of trespass to try title, and was filed on the 7th of August, 1903.

The defendants filed a general denial and plea of not guilty; and they also specially plead under the Act of the Legislature in question, that they were the owners in fee simple of the tract of land in controversy, describing the same by metes and bounds, which comprises two grants, each for four leagues, one known as the El Perdido, granted to Pedro Garcia by the State of Tamaulipas, Republic of Mexico, prior to the 19th of December, 1836; and the other known as the Vargas, granted to Juan Garza Diez, by the State of Tamaulipas, prior to the 19th of December, 1836; that the defendants' title had its origin at such time as to come within the protection guaranteed by the treaty of Guadalupe Hidalgo, proclaimed on the 4th day of July, 1848.

The case was tried before the court, and judgment rendered for the defendants for the land described in their answer.

The State also claimed that although the Vargas and El Perdido called for the northern line of the Santanita; that the south boundary line of the two former surveys did not reach the north line of the Santanita, for the reason that in constructing the lines of the Vargas and El Perdido course and distance from their north established corners would not reach and extend to the Santanita; and that as the State was entitled by virtue of locations made under certificates for the Texas and Mexican Railway to surveys that she was entitled to for the school fund by virtue of such location, that she was entitled to recover the lands embraced within the claimed vacancy. In other words, the contention is that as to this branch of the case, there was at the time that the locations were made, a vacancy between the south line of the Vargas and the El Perdido on the one hand, and the north line of the Santanita on the other.

We find the following facts: That there were locations made by the State, as claimed. It is also admitted that the appellees hold the land described in their answers by regular chain of title from and under Pedro Garcia and Juan Garza Diez, which transfers and claims of title were all duly recorded in Hidalgo County. The title of the appellees to both of the surveys is based upon decree No. 24 of the State of Tamaulipas, of date October 19, 1833. On the 12th day of August, 1835, Diez, before the Ayuntamiento of Carmago, denounced four square leagues of pasture land at the place commonly called Vargas. On August 12, 1835, the Ayuntamiento, at its ordinary session resolved to certify that Diez had a good deal of stock, and owned no pasture land whereon to graze the same, and that Diez was a citizen of the town and had not emigrated from the same for any reason whatever; and on the 14th day of August, he also denounced to the constitutional alcalde the land in question, stating that he had an amount of stock and no land on which to keep the same, with the statement that he would pay the appraised value, and with the request for a measurement and demarkation. On the same date the denouncement was presented and admitted with an order that it be proceeded to ocular inspection and measurement and demarkation of the land, after having duly cited the contiguous owners and the Surveyor General of the State. On the 15th day of August, 1835, the constitutional alcalde ordered that citation issue to the contiguous owners and the surveyor of the State, Antonio Canales, and that the party be notified to appoint an appraiser in his behalf, together with the town attorney, who had been appointed appraiser in behalf of the government in denunciations of the nature of the present one, both of whom, after having taken the oath prescribed, shall appraise the land that is to be measured and demarked. It appears that appraisers were appointed, and that demarkation and appraisement resulted under ocular inspection and examination of the tract called Vargas, and that such return was made on the 22d day of August, 1835. Among other calls indicating the demarkation is a survey on the west named the Rucia, and on the south of the Santanita. On September 13, 1835, it was ordered that the proceedings be delivered to the state surveyor, in order to permit him to draw the necessary plan; that on said day the sur-

veyor returned the proceedings with the necessary plan, to which is attested that the four square leagues of pasture land measured to Diez are worth $40, which amount, together with the proceedings, was forwarded to his Excellency the Governor, that upon examination thereof he may order that which may be of his superior pleasure. The plan and survey made by Canales, who was the Surveyor General of the State of Tamaulipas, places the form of the survey in a rectangle, with substantially the following calls: The southwest corner, boundary of the Chapitito; the northwest corner, boundary of the Calvo; the northeast corner, boundary of the Gallo; the southeast corner, boundary of the San Augustine Montalveno. This boundary line is bounded on the west by the Rucia tract, on the south by the Santanita, on the north by the El Cantada, and on the east by the Perdido tract. These are the boundaries of the Vargas, with the exception of the distance given in running from the different corners. On the 15th day of September, 1835, the surveyor made his return of the field notes and plat, and on the 18th of March, 1836, his receipt for $40, the purchase price, was issued to the grantee Diez, and on the 24th of March, 1836, the Attorney General declared all the proceedings regular as prescribed by the colonization laws, with the only thing remaining to be done the approval of the Governor in all of its parts, and to issue to Diez the necessary title of ownership and order the alcalde of Carmago to place him in possession. On the 25th day of March, 1836, the Governor of Tamaulipas issued the grant, and on the 17th day of April, 1836, it appears from the evidence that the alcalde placed Diez in juridical possession, observing the usual form then in existence to accomplish that purpose.

Like proceedings were had in the grant of four leagues known as the El Perdido to Pedro Garcia. July 20, 1835, he denounced four square leagues at a place called Perdido. On the 16th of August, 1835, the appraisers were appointed; on the 23d of August, 1835, the lands were inspected; on the next day they were surveyed; on the 15th of September, 1835, the appraisers valued the land at $10 per league, and on the 15th day of September, 1835, the alcalde directed the proceedings to be delivered to the state surveyor that he might draw his plan, and he states that the amount, $40, together with the proceedings, were forwarded to his Excellency the Governor. The Perdido granted to Garcia is also in the form of a rectangle of four leagues, with the following boundaries: southwest corner, boundary of the Calvo; southeast corner, boundary of the Calvo; northeast corner, boundary of the Coyote; northwest corner, boundary of the Gallo. Call on the east line of this survey is for the pond of the Perdido. This pasture land is bounded on the west by the Vargas, on the south by the Santanita, on the north by the El Cantada, and on the east by the Blanca. Receipt for the $40 was issued March 18, 1836. On the 21st of March, 1836, the Attorney General declared all the proceedings regular, as prescribed by the colonization laws, the only thing remaining for the government to do is to appraise the same, and to deliver to the petitioner his title. The grant was issued by the government on the 22d day of March, 1836; and on the 18th day of April, 1836, with the usual formalities then existing, the alcalde of Carmago placed Garcia in juridical possession of the land.

There is evidence to the effect that Canales usually left an excess in

the surveys made by him, and at one point the surveyor who surveyed the land subsequent to its location found a corner establishing a common line between the La Rucia grant and the Santanita. The Vargas called for the La Rucia, and the evidence shows that, constructing the two surveys in controversy according to course and distance running south from their northern corners, there would be an excess of about 6000 acres in the two surveys, but not all of this excess would lie on the southern end of the surveys, but some would exist on the sidelines.

It is contended by the State that the judgment is erroneous for the reason that the grants were not completed prior to the second day of March, 1836, the date of the declaration of the independence of Texas; and that as prior to that time they were mere incipient or imperfect titles. which had no standing in the courts of this State, because the Act of 1901, that authorizes the confirmation of titles in the territory where these lands are situated, did not include or permit the adjudication of equitable titles; that the grants were not within the protection of the treaty of Guadalupe-Hidalgo, which by virtue of the terms of the protocol to that treaty, the protection afforded only operated upon titles which were complete before the second day of March, 1836.

It is provided in the first section of the Act of the special session of 1901, page 5, providing for the confirmation and for testing the validity of titles within the boundaries of Texas, where the tracts in controversy are located, "that any person or persons who may be the original grantee, heir, legal assign, or in any manner the owner or claimant of any grant, tract or survey of land or part, situated between the Nueces and Rio Grande Rivers, and below a line drawn from the northern boundary of Webb County to the mouth of Moros creek, where the same empties into the Nueces River, and emanating or claimed to have emanated from the Spanish or Mexican governments, and having its origin at such time as to be, and being within the protection guaranteed by the treaty of Guadalupe Hidalgo, entered into between the United States and Mexico, and proclaimed on the 4th day of July, 1848, may file a petition in the District Court of Travis County, Texas, against the State of Texas, as defendant, for the confirmation of the title thereto, and also for the adjudication of his, her or their title, right, interest or claim therein and thereto, as against the State; which petition shall be filed with the district clerk of the county in which suit is brought, at least twenty days before the time of holding the next succeeding term of the District Court in and for such county, and shall contain a full description of the grant, tract or survey of land claimed, setting forth particularly its situation, boundaries and extent, and the ownership, right, interest or claim of the plaintiff or plaintiffs and each of them, in and to said land, and the source from which such ownership, right, interest or claim emanates, and shall accompany and file with such petition the titles or evidences of titles or right or true copies thereof, and if in a foreign language, in addition, true translations thereof, under which the same is held or claimed, or if such ownership, right, interest or claim of plaintiff does not have its origin in or is not based upon such written evidences of title, right, interest or claim, then a statement in writing, setting forth substantially the facts upon which said ownership, right,

interest or claim is based and of which it consists; and the District Court shall thereafter, at a regular term thereof investigate the same and try said cause in accordance with the laws of nations, the laws, usages and customs of the government from which said ownership, right, interest or claim emanates or is derived, and the constitution, laws and treaties of the United States of America, and of this the State of Texas, and the principles of equity, so far as the same are applicable, and if in accordance therewith the plaintiff, or plaintiffs, as the case may be, shall by a preponderance of the testimony show that he is entitled thereto, shall give judgment in favor of such plaintiff or plaintiffs against the State, in favor of and for the confirmation of the title to said land, describing the same by metes and bounds, or in favor of the State against such claimant or claimants, as the facts may warrant."

There are other provisions of the Act, one of which authorizes the State to bring suit. It is insisted that this Act does not permit the adjudication of imperfect or equitable titles asserted by the claimant which had its origin under the Mexican government. It is true that this statute in question, as was the case in the Acts of 1860 and 1870, does not in express terms, authorize the adjudication and confirmation of imperfect titles. But the language of the Act in effect declares that the court may determine and adjudicate the right or title of a claimant relying upon a title purporting to emanate from the Mexican government. The language here is about the same as that contained in the Act of Congress of March 3, 1851, passed for the purpose of ascertaining and settling claims to lands existing in California derived from the Mexican government. Chief Justice Taney, in the case of Fremont v. The United States, 17 How., 553, in construing this Act, uses this language: "It will be seen from the quotation we have made that the 8th section embraces not only inchoate or equitable titles, but legal titles also, and requires them all to undergo examination and be passed upon by the court." As said before, the language used in the Act of 1901, in its terms substantially employs, so far as designating the character of title that might be adjudicated, similar language to that used in the 8th section of the Act of Congress of 1851; and the construction placed upon that act by the Supreme Court of the United States in the Fremont case is applicable to the Act of the Legislature under which this present claim was adjudicated. As bearing out this construction it is not reasonable to suppose that the Legislature would limit the jurisdiction of the court to passing upon merely legal titles, which became perfect and absolute prior to the time that Texas declared her independence, for it is well settled that titles that had reached the point that they could be considered as final and legal needed no protection at the time of change of government from the treaty. (Fremont v. United States, 17 Howard, 553; Dent v. Emmeger, 14 Wall., 308; Ainsa v. New Mexico & A. Railway, 175 U. S., 76.

If, as contended by the State, the title was merely equitable, and was not embraced in the Act of 1901, the courts would have no power to adjudicate and establish that title, for it is too well settled now to admit of contradiction that equitable rights claimed by virtue of a treaty in the territory ceded, can not be adjudicated and established by the courts until the political department provides the remedy. (Trimble v.

Smithers, 1 Texas, 789; League v. Young, 2 Texas, 500; Jones v. Borden, 5 Texas, 412; McMillan v. Hodge, 5 Texas, 77; Paschal v. Perez, 7 Texas, 366.)

In Astiazaram v. Santa Rita Land & Mining Company, 148 U. S., 81, the court says: "Undoubtedly private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction and were entitled to protection, whether the party had full and absolute ownership of the land, or merely an equitable interest therein which required some further act of the government to vest in him a perfect title. But the duty of providing the mode of securing these rights and of fulfilling the obligations imposed upon the United States by the treaties, belong to the political department of the government, and Congress might either itself discharge that duty or delegate it to the judicial department." Citing many cases.

The Supreme Court of the United States, also in the case of United States v. Santa Fe, 165 U. S., 675, states that the duty of protecting imperfect rights of property under treaties, such as those by which territory was ceded by Mexico to the United States, in existence at the time of the cession, rests upon the political and not the judicial department of the government; and to the extent only that Congress had vested them with authority to determine and protect such rights can courts exercise jurisdiction. Where, therefore, a tribunal of limited jurisdiction is created by Congress to determine such rights of property, a party seeking relief must present for adjudication a case clearly within the Act, or relief can not be given." Citing authorities.

This doctrine is maintained in many recent decisions of that court, among which is United States v. Sandoval, 167 U. S., 292; Ainsa v. The United States, 161 U. S., 218.

In the construction of those provisions of a treaty that provide for the protection of property of owners within the ceded territory, it has been uniformly held that the term "property" embraces all rights, whether legal, equitable or imperfect. (Strother v. Lucas, 12 Pet., 435; Hornsby v. United States, 10 Wall., 224.) It could not seriously be contended that on the 2d day of March, 1836, the date of the declaration, that the territory where the property is situated was within the limits of Texas, or that the mere declaration announced upon that date could affect the territory where these lands were situated, because at that time that portion of the State which is now embraced within its boundaries was a part of the State of Tamaulipas. Texas up to that time had not, and did not prior to the 19th of December, 1836, ever seriously assert any claim or right that her boundaries included the territory where is situated the land in controversy. Then, if this be true, we must ascertain and determine what effect the protocol of the treaty of Guadalupe Hidalgo had upon the territory where the lands in question are situated; for if it should be determined that it was not the intention of the protocol to control the eighth article of the treaty, or to affect titles to lands emanating from the State of Tamaulipas prior to the time that Texas had ever asserted any right to any part of the territory of the State of Tamaulipas, or if we should determine that the expression "legitimate titles" mentioned in subdivision 2 of the protocol, was not intended solely to apply to legal titles existing prior to the

second day of March, 1836, then under the principles of law as stated, that should apply to equitable titles, the title in controversy should be protected, whether the grant was complete or imperfect on the second day of March, 1836.

The facts detailed in the record with reference to the steps taken to acquire the grants from the government of Mexico, clearly show that everything necessary to be done was done at a time when the State of Tamaulipas had sole and exclusive jurisdiction over the territory where the lands are located, and the title became perfect at a time when such jurisdiction existed. Under the view expressed and heretofore stated and hereafter to be stated, whether we regard the title as legal or equitable, it is entitled to protection under the facts as found by this court.

By the eighth article of the treaty of Guadalupe Hidalgo, it is provided that property of every kind belonging to Mexicans in the ceded territory shall be inviolably respected. In the protocol agreed to between the two governments upon the suppression of the tenth article of the treaty, as originally submitted, and which protocol was an agreement reached by the government upon the suppression of that article, it is provided that "the American government by suppressing the tenth article of the treaty of Guadalupe Hidalgo, did not in any way intend to annul the grants of land made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the article of the treaty, preserve the legal value which they may possess, and the grantees may cause their legitimate titles to be acknowledged before the American tribunals. Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th day of May, 1846, and in Texas up to the 2d day of March, 1836."

It is contended that this provision of the protocol is a limitation upon the general terms of the 8th article of the treaty that so far as Texas is concerned, it was the intention by the use of the expression "legitimate titles" to only protect perfect legal titles that existed in Texas on the second day of March, 1836. We have not been able to find any case in which such a construction has ever been placed upon the treaty; but to the contrary, it has been inferentially held in State v. Bustamente, 47 Texas, 321; State v. Sais, 47 Texas, 309, and other Texas cases on the same lines that might be mentioned, that steps taken to acquire title subsequent to the 2d day of March, 1836, could be considered in determining whether such equities were shown as would authorize the court to decree confirmation in favor of the claimant. The court evidently in those cases had before them the treaty between this government and Mexico and the protocol, which is a part of the treaty. And in the Bustamente case it is stated that the title offered by the claimant in that case was excluded upon the ground that it was executed at a time at which Mexico had lost her jurisdiction over the territory where the lands were situated; and the location of the lands considered in those cases and other similar cases, was within the State of Tamaulipas; and in that case the intimation is clear that if the equitable steps had been complete, or the title had been finally issued prior to the 19th day of December, 1836, or possibly prior to 1846, when the American govern-

ment by its armed occupation assumed jurisdiction over that portion of the country where the land is situated, such titles would have been confirmed.

In cases brought before the Supreme Court of the United States in passing upon titles emanating from the Mexican government to lands situated in California, we have found no instance in which the expression "legitimate titles" used in the protocol, was held to mean a perfect grant existing on the 13th day of May, 1846. But upon the contrary, that court has held that protection would be afforded to titles emanating subsequent to that date up to the 7th day of July, 1846, the time when the American troops captured Monterey, the then capital of California, and by virtue of such occupancy became the masters of that territory and assumed jurisdiction over it. (Stearns v. United States, 73 U. S., 594; Hornsby v. United States, 10 Wall., 224; More v. Steinbach, 127 U. S., 70; United States v. Pena, 175 U. S., 500.)

The terms "grants" and "legitimate titles," employed in the protocol, we do not think mean an absolute perfect grant existing on the 2d day of March, 1836, in Texas, and on the 13th day of May, 1846, in California. The meaning conveyed by the expression "legitimate titles" could not be held to mean that it related to a stronger title than would be implied from the use of the word "grants." Now the expression "grants" that is employed in treaties, comprehends, says the Supreme Court of the United States, in Strother v. Lucas, 12 Pet., 435, "not only those which are made in form, but also any concession, warrant, order or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession." Citing authorities.

The article quoted in the protocol expressly states that it is not the purpose by the suppression of the 10th article to annul grants, and that those grants, notwithstanding the suppression of the article of the treaty, preserve the legal value which they may possess; and the grantees may cause their legitimate titles to be acknowledged in the American tribunals. The words "legitimate titles" as here used, in the subsequent portion of the protocol quoted, mean titles that are comprehended in the term "grant"; and when we have ascertained that the construction of the term "grant" as employed in treaties, embraces all character of titles, legal or equitable, it reflects the sense and meaning in which the term "legitimate titles" was intended to be employed. The case cited was decided by the Supreme Court of the United States in 1838, about ten years prior to the execution of the treaty of Guadalupe Hidaljo; and it is reasonable to assume that the term "grant" employed in the treaty, would be and should be given a construction and application that had been previously determined by the Supreme Court. Therefore we reach the conclusion that the expression "legitimate titles" does not mean merely to embrace titles that had become absolute and legal, but also was intended to apply to equitable titles existing at that date, which, if there had been no change of sovereignty, would thereafter have become perfect, if the steps had been taken to acquire the legal title, and the equities had become so perfect that the claimant could have demanded the legal title prior to the time that Texas or the United States government assumed jurisdiction over the territory where the lands may be situated. The fact is too well settled now to admit of dispute, but that the eastern

boundary of Tamaulipas extended to the Nueces River, including the land in controversy, at least up to the 19th day of December, 1836, when Texas by an Act, undertook to extend her boundaries to the Rio Grande River. It is not necessary for us to determine whether her mere paper title to such extension was valid, and whether Tamaulipas did not, prior to the occupation by the American troops in 1846, lose her jurisdiction over the territory lying between the Rio Grande and the Nueces, for all of the proceedings in this case, the equitable steps taken to acquire title, as well as the issuance of the legal title, occurred prior to the 19th of December, 1836.

Escandon, as early as 1749, on his mission of pacification and settlement of the territory subsequently known as New Santander, reached the Rio Grande River in that year, and dispatched Capt. Nusterra to form a settlement on the Nueces River; and since then the lands lying between the lower Rio Grande and the lower Nueces Rivers have been regarded as a part of the province of New Santander, and subsequently the State of Tamaulipas. Austin's map prepared in 1835, places the eastern line of Tamaulipas at the Nueces River. Its eastern boundary and location as existing at this stream is recognized in the case of State v. Cardinas, 47 Texas, 252; State v. Sais, 47 Texas, 309; Texas & M. Ry. Co. v. Locke, 74 Texas, 387; State v. Bustamente, 47 Texas, 321. In this latter case it is in effect held that the jurisdiction of Tamaulipas extended over this territory, at least until the 19th of December, 1836, if not to 1846, at which time the claim of Texas was perfected by acts of possession, and from that time such jurisdiction was lost to the State of Tamalipas.

Now, if we should give the effect to the protocol as contended for by the appellant, that is that it only undertook to protect legal titles existing in Texas on the second day of March, 1836, it would not result in disturbing the title of appellees. The protocol only undertakes to relate to titles existing in Texas on the second day of March, 1836. This is an express declaration that relates to titles existing in Texas upon that date; and it would be doing violence to the rules of construction to say that it applies to lands and to portions of that part of the ceded territory which did not belong to Texas, but belonged to some other of the Mexican states. As before said, confessedly the territory within which these lands are situated was indisputably a part of the State of Tamaulipas on the second day of March, 1836, and there was not, and up to that time had not been any recognized right of Texas to this portion of the country. The purpose and object of this provision of the protocol was, as said, merely to affect lands located in Texas at the date of the declaration of independence, to wit: March 2, 1836. And it certainly could not be contended that this provision affected the lands in question because, as said before, it is beyond dispute that they were not located in Texas at that time, but were within the limits of the State of Tamaulipas. Consequently, taking this view of the question, the protocol could not be intended to operate as a limitation upon the protection afforded by the eighth article of the treaty, which broadly embraces all property, and protects all rights of Mexicans within any portion of the ceded territory. Therefore, upon the main question involved in the case, that is, the validity of these grants, we must hold

that there was no error in the ruling of the trial court in rendering judgment against the State, and in confirming the grants.

The other question to be considered is one of boundary. We have, in a limited way, stated the evidence bearing upon this question and the contention of the State. The two grants call for the Santanita as their south boundary line. In reaching this point the distance falls short when the surveys are constructed from the calls establishing the northern line of the surveys. The testimony shows that Canales, the Surveyor-General, who did the surveying in this instance, as a general thing so located grants as to create an excess. There is some evidence in the record by which the north line of the Santanita can be identified. In Maddox Bros. v. Fenner, 79 Texas, 290, it is in effect held that the call for the line of another survey would, in certain instances, prevail over course and distance; and we are not prepared to say that in this case the court did not properly apply to the facts the rule announced in the case referred to. In that case it is also held that the mere fact that a great excess would exist in extending the line to the survey called for, would not militate against the construction that the court gave to the calls. Now the excess in that case was greater in proportion to the number of acres called for in the survey, than is the case of the excess shown to exist in the case before us. Furthermore, if there should be any doubt as to which of the calls should prevail, that for course and distance or that for the north line of the Santanita, it should be resolved in favor of the long asserted right under the juridical possession which is shown in this case.

In the United States v. Pico, 72 U. S., 540, it is held that in the absence of controlling calls, the extent of the grant is only subject to the power of the Governor under the colonization laws, and when there is any doubt about the intention to include all the land within the boundary it will be removed by the juridical possession delivered to the grantee. There is some evidence relating to the act of juridical possession, which would justify the conclusion that it extended to the north line of the Santanita; and whatever doubts at this late date could be indulged in with reference to which of the calls should prevail, should be resolved in favor of that construction that would include and embrace the land determined by the act of juridical possession.

We find no error in the record and the judgment is affirmed.

*Affirmed.*

Writ of error refused.