THE TEXAS-MEXICAN RAILWAY COMPANY V. W. M. LOCKE ET AL.

No. 5786.

1. **Archives—Relevancy of Testimony.**—A Land Office translation of a copy of a report of the Secretary of State for Coahuila and Texas to the Political Chief of Bexar, of date January 2, 1833, giving a statement of colonial grants made under decrees of March 24, 1825, and April 28, 1832, including the grants whose validity is in litigation, is relevant to support the grants. The translation is from a report transferred from the officer to whom made to the office of the county clerk of Bexar County, and from that office to the Land Office, from which the translation was certified.

2. **Same—Colonial Contract.**—A certified translation from the Land Office of a testimonio of the original of a colonization contract made at Monclova and given by the proper authority is competent as evidence, and if the land in controversy or part of it was within the limits of the colony whose commissioner extended the final title to it, then such document is relevant testimony.

3. **Concession.**—That an application to purchase land was more limited than the concession granted upon the application does not affect the validity of the concession, which on its face and by its terms is more extended than the application. The concession conferred the right to have the land titled to the holder.

4. **Testimonio.**—The protocol being in Mexico and the testimonio being in the Land Office in Texas as an archive, the instruments relating to land and being a colonial contract, "no case can be found in which it has been held that a copy certified from the Land Office was not admissible in evidence."

5. **Cases Adhered to.**—Houston v. Perry, 3 Texas, 393; Hatch v. Dunn, 11 Texas, 713; Bissell v. Haynes, 9 Texas, 556; Robertson v. Teal, 9 Texas, 344; Paschal v. Perez, 7 Texas, 356; Herndon v. Casiano, 7 Texas, 322.

6. **Concession.**—A concession was a necessary link in a land grant made by the Mexican Government to purchasers. Such concession was proved by the testimonio of

it; that such testimonio was not attached to the grant does not render it incompetent as evidence.   Nor did the fact that the testimonio of the concession was retained by the grantee affect its validity; the officer extending the grant in this case had recited the existence of the concession in the instrument extending the title.

7.   **Authority of Commissioner to Extend Title.**—The commission to Soto to extend titles on its face did not indicate the locality of the land, but where the concession was sufficiently full to include lands granted, authority in the concession together with the appointment, had the effect of conferring power to extend the grant.

8.   **Archive.**—In the absence of any objection to its genuineness we are not prepared to hold that a paper which would be a proper archive of a government now foreign affecting lands in Texas is not legally archived in the General Land Office.   A certified copy of such original now in the Land Office was properly admitted in evidence.

9.   **Form of Title.**—The testimonios of the titles are unusual in form, not containing petitions to the commissioner for extension of final title with general designation of land desired, accompanied with the concession, nor a reference to the empresarios, their consent, order of survey, report of survey, etc., but it can not be held that for the want of such things, as the testimonios contain the essentials of a final title, they ought to be excluded when offered in evidence.

10.   **Ancient Instrument.**—A testimonio of a grant of land bearing date 1834 was deposited in the Land Office in 1845.   The survey was placed upon the map in the Land Office and upon the map of the district in which it was situated in 1846.   The grant was in the Abstracts of Titled Lands printed in 1852 and 1878; possession was held under the grant from 1868; in 1875 the testimonio was withdrawn from the Land Office by the agent of the grantee; taxes were paid by those holding under the title from 1871.   *Held*, that the testimonio was admissible as an ancient instrument.

11.   **State Constitution—Powers of.**—It is doubtless within the power of a State through a constitutional provision to declare what evidences of right may or may not be archived in the Land Office or recorded in the several counties, or to declare what notice of ownership of land may be evidenced by delineations upon public maps.

12.   **State Constitution, Article 13, Section 4.**—The declaration in article 13, section 4, of the State Constitution, "that no claim of right or title to land which issued prior to the thirteenth day of November, 1835,   *   *   *   shall ever hereafter   *   *   * be used as evidence in any of the courts of this State," unless it had been archived in the General Land Office or recorded in the county in which the land was situated at the time of record, could have application only to such evidences of right as before that time could have been archived or recorded—to writings evidencing titles.

13.   **Same.**—Prior to the adoption of the present Constitution failure to register evidences of titles to land did not render them inadmissible in evidence on proper proof of their execution, and the only effect of failure to register was to render them inoperative as to creditors and subsequent purchasers for value without notice.

14.   **Same.**—The effect of this section 4, article 13, of Constitution, was to deny to the holders of such claims as were not archived or recorded at its adoption the right or power to exhibit their rights in due course of law.

15.   **Same—Destroying a Right.**—A right existing to-day and susceptible of proof under well established rules of evidence applicable to all persons by the writing creating, and by law required to be given as the evidence of the particular right, which in consequence of legislation of to-morrow may not thus nor in any other manner be established in a court of justice, is practically a right destroyed.

16.   **Same—Possession—Retroactive Legislation.**—The only means recognized in said section 4, article 13, for establishing titles not archived or recorded is by possession such and so long continued that a grant therefor may be presumed under the rules applicable to that subject.   Prior to the adoption of the Constitution persons owning such grants were not required to remain in possession as a condition upon which

the continuance of the right depended. A subsequent law making possession the only evidence of proving a title, valid when it was issued, would be subject to the objections urged against retroactive legislation.

17. **Impairing Obligation of Contract.**—Legislation in whatever instrument found which forbids the introduction of evidence of a prior contract admissible and made necessary to the validity and existence of the contract by the law in force at the time it was made, unless it provides some other method for making sufficient proof of the necessary facts accessible to the person called upon to make the proof, impairs the obligation of such contract.

18. **Same—State Constitution in Conflict with Constitution of United States.**—We are of the opinion that the provision of the Constitution of this State under which it is claimed the evidence under consideration (the testimonio of the grant, genuineness of signatures being conceded) should have been excluded, is in conflict with the provisions of the Constitution of the United States, viz., the fourteenth amendment: * * * "Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" and of article 1, section 10: "No State shall * * * pass any * * * law impairing the obligation of contracts."

19. **Treaty of Guadaloupe-Hidalgo.**—This treaty, proclaimed July 4, 1848, protected the rights of Mexican citizens in titles to lands owned by them March 2, 1836. The grants appear to have been made to Mexican citizens, and no change in ownership appeared prior to the treaty. It seems that the title here in controversy was protected thereby.

20. **Case Followed.**—Jenkins v. Chambers, 9 Texas, 234, adhered to.

21. **Presumptions of Regularity of Official Acts.**—Nothing short of a law clearly showing a usurpation of power in the acts of a duly appointed commissioner who extended the titles April 18, 1834, will justify the holding that such titles were invalid, in view of the course pursued by the government of the State and other officials who must be presumed to have understood their powers and have in good faith acted upon them.

22. **Same—Construction of Repealing Act.**—The articles 29 and 30 of Decree 272 in terms repealing *so much of all former instructions as were inconsistent with its* provisions, and declaring that no further colonization contracts should be made, but that those theretofore made should be strictly fulfilled in accordance with the law of March 24, 1825, did not destroy the authority to complete titles where concessions had been made to purchasers under existing laws.

23. **Junior Title—Color of Title.**—The holders of land under "junior title" or "color of title," as stated in sections 1 and 2, article 13, of the Constitution of the State, are those holding under a grant or patent subsequent to the one in conflict, or under such title matured upon a location prior to the adoption of the Constitution. Such *junior* title, etc., is entitled to the presumptions attached to such titles in said sections.

24. **Titled Lands—Protected from Location.**—The concessions being genuine and Soto having been authorized to extend titles and having done so, the defendants having exhibited such title to the land sued for (no issue as to forgery being made) the questions whether the conditions upon the grants had been complied with, whether Beales had attempted a fraud upon the government in acquiring more than eleven leagues of land, or whether the land was within the proper boundaries of the commissioner, can not be raised by one locating upon the land subsequent to the adoption of the State Constitution and in violation or it.

25. **Cases Cited and Approved.**—Windsor v. O'Connor, 69 Texas, 571; Truehart v. Babcock, 51 Texas, 177; Westhrope v. Chambers, 51 Texas, 187; Sommers v. Davis, 49 Texas, 541.

APPEAL from Bexar. Tried below before Hon. G. H. Noonan. The opinion states the case.

*Ogden, Ogden & Johnson,* and *Thomas W. Dodd,* for appellant.—There is but little or no dispute about the facts of these cases, and it was the endeavor of the attorneys in the trial in the court below to eliminate from the cases by written stipulations and agreements all immaterial and technical questions, and, indeed, to go further and stipulate every fact that it was believed was capable of proof.

This was done in accordance with the common wish that the records in these cases should squarely present for the decision of this court the only question in the case, which may be stated as follows:

Were the lands in question at the date of appellant's files vacant unappropriated public domain of the State of Texas, subject to file, entry, location, and survey by virtue of genuine, unlocated, valid land certificates; or were said lands the private property of the appellees, under such right, title, or claim, either legal or equitable, as segregated them from the public domain of the State and reserved them from location?

The logical investigation and determination of this question will be greatly facilitated by propounding the following queries:

First Query. Does it appear from the records in these causes that under the laws of Coahuila and Texas the title to the lands in controversy had passed from the government and vested in the "five Mexican" grantees prior to the independence of Texas?

Second Query. Have the rights of the alleged grantees as they existed at the date of the independence of Texas been, by the acts of the parties or their representatives or assignees, or by the provisions of the Constitutions and laws of the Republic and State of Texas, either strengthened and confirmed or forfeited and abandoned?

We believe these to be the true issues in these cases, and therefore respectfully ask the permission of the court to submit the following brief, subdivided into propositions under the two queries propounded above:

1. The concessions under which appellees claim were not intended to and did not concede to the five Mexican grantees the right to select and purchase the lands in controversy, and can not therefore be relied upon as evidence of title to the same, and did not confer upon Fortunato Soto the authority to execute the pretended final titles under which appellees claim.

(1) The Grant and Beales Colony was situated in the department of Bexar, as stated in the petition and contract for same, dated respectively October 5 and 9, 1832.

(2) Fortunato Soto was appointed commissioner of this colony March 13, 1834.

(3) The concessions under which appellees claim authorized the pur-

chase of lands in the department of Monclova.    Art. 7, Pre. Pro. Court
Coahuila and Texas, Laws Coahuila and Texas, p. 304; Decree 164, Laws
Coahuila and Texas, p. 171; Decree 270, Laws Coahuila and Texas, p.
245; Decree 283, Laws Coahuila and Texas, p. 274; Art. 14, Decree 190,
Laws Coahuila and Texas, p. 190; 1 Laws Rep. Texas, pp. 133, 134; Clay
v. Holbert, 14 Texas, 202; Hancock v. McKinney, 7 Texas, 386; Swisher
v. Grumbles, 18 Texas, 173, 177; Robertson v. Mossen, 26 Texas, 251,
252; Goode v. McQueen's Heirs, 3 Texas, 253; Hanrick v. Jackson, 55
Texas, 27; Jenkins v. Chambers, 9 Texas, 219; United States v. Deles-
paine, 15 Pet., 333; 2 Waite's Act. and Def., 503; U. S. Pub. Treaties,
494; Yoakum's Hist. Texas, vol. 1, pp. 77–248, 277; Kennedy's Hist.
Texas, book 1, p. 8, book 2, pp. 113, 153.

2.    The pretended concessions relied upon as the foundation for the
titles under which appellees claim, if ever valid, had expired and become
forfeited before any rights pretend to have been acquired to any portion
of the land in question, and did not therefore confer upon Fortunato
Soto the power or authority to execute the final titles under which ap-
pellees claim at the date that he purports to have done so.    Art. 16,
Decree 190, Laws Coahuila and Texas, p. 191; Hancock v. McKin-
ney, 7 Texas, 447–459; Paschal v. Perez, 7 Texas, 366; Edwards v.
James, 7 Texas, 372; McMullen v. Hodge, 5 Texas, 79; Hossner v. De
Young, 1 Texas, 769, 770; Heirs of Holliman v. Peebles, 1 Texas, 702;
State v. Sais, 47 Texas, 315; Hatch v. Dunn, 11 Texas, 716; Johnson v.
Smith, 21 Texas, 728; Williamson v. Simpson, 16 Texas, 435; State v.
Delesdenier, 7 Texas, 101; Jenkins v. Chambers, 9 Texas, 219; Kimmell
v. Wheeler, 22 Texas, 85; Hunnicutt v. Peyton, 107 U. S., 361; United
States v. Ross, 92 U. S., 281; Easton v. Salisbury, 21 How., 431; Hale v.
Gaines, 22 How., 159; Freemont v. United States, 17 How., 555; Ville-
mont v. United States, 13 How., 266; Stoddard v. Chambers, 2 How.,
318; Buyck v. United States, 15 Pet., 215; O'Hara v. United States, 15
Pet., 275; United States v. Delespine, 15 Pet., 219; United States v.
Wiggins, 14 Pet., 314; United States v. Kingsley, 12 Pet., 476; Polk's
Lessees v. Wendall, 9 Cranch, 87; Hoofnagle v. Anderson, 7 Wheat., 215;
Sedg. on Stat. and Const. Law, 212, note; Kennedy's Hist. Texas, book
2, pp. 33–56.

3.    These titles were issued under Decree 190 of 1832, and unlike titles
issued under Decree 16 of 1825, were coupled with a condition pre-
cedent of the payment of the purchase money, and without proof of the
performance of such condition the titles must fail.    Art. 24, Decree 16,
Laws Coahuila and Texas, p. 19; art. 13, Decree 190, Laws Coahuila
and Texas, p. 190; art. 32, Decree 190, Laws Coahuila and Texas, p.
193; McMullen v. Hodge, 5 Texas, 79; Rich v. Keiser, 54 Pa. St., 86.

4.    The documents signed by Fortunato Soto, which purported to be
testimonios of final titles or acts of possession issued by virtue of said

concessions, were dated on the 18th day of April, 1834, two days after the concessions had expired and become forfeited.   Hancock v. McKinney, 7 Texas, 447–459; Paschal v. Perez, 7 Texas, 366; Edwards v. James, 7 Texas, 372; McMullen v. Hodge, 5 Texas, 79; Hossner v. De Young, 1 Texas, 769, 770; Heirs of Holliman v. Peebles, 1 Texas, 702; Easton v. Salisbury, 21 How., 431; Hale v. Gaines et als., 22 How., 159; Buyck v. United States, 15 Pet., 215; O'Hara v. United States, 15 Pet., 275; United States v. Delespine, 15 Pet., 219; United States v. Wiggins, 14 Pet., 314; United States v. Kingsley, 12 Pet., 476.

5.   Again, presumptions that officers have done their duty can not supply proof of a substantive fact, and such presumptions are inadmissible where the act of the officer appears to be in violation of the well ascertained law of the land.   Heirs of Holliman v. Peebles, 1 Texas, 699; United States v. Ross, 92 U. S., 281; Stoddard v. Chambers, 2 How., 318; Polk's Lessees v. Wendall, 9 Cranch, 87.

6.   The pretended testimonios of final title upon which appellees rely were absolutely void from the date of their issuance, for the reason that Fortunato Soto had then no power or authority in the premises, whatever authority he may have once had having been revoked by express laws. Art. 5, Decree 190, Laws Coahuila and Texas, p. 189, Decree 272, Laws Coahuila and Texas, p. 247; Decrees 289, 293, 309, 318, Laws Coahuila and Texas; Clay v. Clay, 26 Texas, 29; Jenkins v. Chambers, 9 Texas, 235; Holmes v. Jones, 56 Texas, 49; Atkinson v. Bell, 18 Texas, 478; Emmons v. Oldham, 12 Texas, 27; Stillers v. Clapp, 3 Texas, 498; Heirs of Robbins v. Heirs of Robbins, 3 Texas, 496; Harlan v. Haynie, 9 Texas, 460; Fulton v. Duncan, 18 Texas, 41; Hatch v. Dunn, 11 Texas, 716; Williamson v. Simpson, 16 Texas, 433.

7.   The testimonios of final title show upon their face to have been issued to Juan Carlos Beales as the attorney in fact for the "five Mexican" grantees, which was expressly forbidden by the law then in force.

Article 12 of Decree 272 of March 26, 1834, Laws Coahuila and Texas, pages 248, 249, reads as follows: "Article 12.   For this object every purchaser on receiving his land shall declare under oath that he has not purchased for another person, but for himself only, or as attorney of another, whom he shall make known by his entire name, and in that case the title shall not be issued until the true purchaser appears to receive it in his own name, which he shall do within one year, under penalty of forfeiting his right and what shall have been paid."

8.   The concessions or primitive titles under which appellees claim were fraudulently obtained and are therefore void.   Arts. 13, 32, Decree 190, art. 12, Decree 272, Laws Coahuila and Texas; Styles v. Gray, 10 Texas, 505; Mason v. Russell's Heirs, 1 Texas, 730; Fulton v. Duncan, 18 Texas, 41; Manchaca v. Field, 62 Texas, 140; Stoddard v. Chambers, 2 How., 318; 3 Wait's Act. and Def., 445, 446.

9.   Thus we submit that the acts of all the parties point to the one conclusion that these grants were originally intended for the benefit of Beales, and were therefore not only fraudulently obtained but were expressly forbidden by law.

Fraud may be proved as any other fact, but direct and positive proof of fraud is not required.   Strauss v. Kranert, 56 Ill., 254; Stikeman v. Dawson, 1 De G. & Sm., 105.   It may be established by proving circumstances from the existence of which a fraudulent intent is an irresistible inference.   Waddingham v. Loker, 44 Mo., 132; Bowden v. Bowden, 75 Ill., 143; Matter of Vanderveer, 20 N. J. Eq., 463; McDaniel v. Baca, 2 Cal., 326; Farmer v. Calvert, 44 Ind., 209; Stewart v Strasburger, 51 How., 388; Kaine v. Weighley, 22 Pa. St., 179.   And circumstances trivial in themselves may when combined together afford irrefragable proof of fraudulent intent.   Hopkins v. Seivert, 58 Mo., 201; Brady v. Barnes, 42 Conn., 512.

"In order to establish fraud the true rule in all courts is to require such legal evidence as will overcome in the mind of the tribunal the legal presumption of innocence, and beget a belief of the truth of the allegation of fraud."   Marksbury v. Taylor, 10 Bush., 519; 3 Wait's Act. and Def., pp. 445, 446.

10.   The pretended grants to Narcisso Aguirre and Antonio Aguirre were and are absolutely void, because they are situated outside of the well defined limits of the Grant and Beales Colony, and Fortunato Soto had no jurisdiction in the premises.   Art. 8, Decree 16, Laws Coahuila and Texas, p. 16; Decree 78, Laws Coahuila and Texas, p. 114; Mason v. Russell's Heirs, 1 Texas, 730; Hamilton v. Avery, 20 Texas, 631; Elliott v. Mitchell, 47 Texas, 447; Hamilton v. Menifee, 11 Texas, 719.

11.   Second Query.   Have the rights of the alleged grantees as they existed at the date of the independence of Texas been, by the acts of the parties or their representatives or assignees or by the provisions of the constitutions and laws of the Republic and State of Texas, either strengthened and confirmed or forfeited and abandoned?

Neither time, legislation, nor the acts of the parties have cured any one of the defects in these titles, nor in any manner added to their strength or virtue.

The appellees rely upon the following facts in support of their title:

(1)   The testimonios were filed in the Land Office in 1845 and remained there until 1875.

(2)   That these grants were delineated upon the maps in the Land Office in 1845, and have continued to be so delineated from that date down to the present time.

(3)   That these grants are to be found in two of the printed abstracts of land titles compiled from the records of the General Land Office, one published in 1852 and the other in 1878.

(4)   That the testimonios of final titles were recorded in the county where the land was situated in the year 1878.

(5)   That the claimants under these grants have paid taxes upon the land from the year 1871 down to the present time.

(6)   That they have been in possession of the lands under those claiming under these grants since the year 1872.

(7)   That they were in actual possession of the land at the date of appellant's files.

(8)   That the General Land Office of Texas has recognized these grants by permitting the cancellation of junior patents on account of conflict with the grants.

Under this general proposition we beg to submit the following subdivisions:

First.   The depositing of the testimonios in the General Land Office had no legal effect whatever, as they were never archives of the office and were improperly filed there.   Hatchett v. Conner, 30 Texas, 110; Herndon v. Casiano, 7 Texas, 322; Paschal v. Perez, 7 Texas, 348.

Second.   The delineation of these pretended grants upon the maps of the General Land Office was unauthorized by law.   The maps of the General Land Office are but indices to its archives, and as there was nothing at the date of the delineation of these grants upon the maps, among the archives of the office, showing the appropriation of the land in question, this delineation can have no effect under the law.   Smith v. Powers, 23 Texas, 29; Gilbeau v. Mayes, 15 Texas, 410.

Third.   The grants should have been stricken from the maps of the General Land Office upon the withdrawal of the testimonios in 1875.   Rev. Stats., art. 3916; Pasch. Dig., art. 4565.

Fourth.   For the same reason that the grants were delineated upon the map without authority, they were also reported in the printed abstracts compiled from the records in the General Land Office without authority.

Fifth.   The registration of the testimonios of final title in Maverick County in 1878 was prohibited by the law then in force.   Const. of Texas, sec. 4, art. 13.

Sixth.   The payment of taxes from 1871 does not relieve the claimants from the requirements of section 3, article 13, of the Constitution.   The Act of May 31, 1871, and section 24 of the Act of May 31, 1873, do not by their terms nor were they intended to relieve claimants from the payment of taxes upon alleged grants which had been long abandoned, and upon which no taxes had been paid, and over which no act of ownership had been exercised for nearly forty years.   These acts were intended as a remedy for the confusions that had arisen in tax matters during and immediately succeeding the civil war.   Const. of Texas, sec. 4, art. 13; Laws 1871, pp. 135, 136; Laws 1873, p. 143.

Seventh. Whatever presumption of the recognition of these grants by the General Land Office that might arise from the fact of permitting the cancellation of patents is certainly rebutted by the fact that these same patents were issued before they were canceled, and the further fact that there are still remaining about 43 surveys, containing about 45,000 acres of land, which are held by subsisting and uncanceled patents, and which conflict with these pretended grants.

Eighth. The possession of the land by the claimants can have no other effect than to serve as notice of their title; if they had no title their possession was and is unlawful and confers no rights, and does not sever the land from the public domain or reserve it from location. Const. of Texas, sec. 2, art. 14; Hanrick v. Dodd, 62 Texas, 91.

*Wælder & Upson, H. E. Barnard,* and *Coopwood & Coopwood,* for appellees. — 1. The reports were made pursuant to a general public law to the political chief, and became an archive in his office relating to the land system of the State, transferable under the laws of Texas to the General Land Office, of which they became an archive and competent record evidence of the facts they stated, and were competent to show the existence of the colony contract and the issuance of the concessions, and relevant as a predicate for the introduction of such contract and concessions and the final titles, and their admission before the court for such purposes was not error affecting any substantial right of the plaintiff. Arts. 9 and 10, Decree 128, Laws Coahuila and Texas, p. 147; Pasch. Dig., arts. 69, 70; McGehee v. Dwyer, 22 Texas, 443, 461, 462.

2. The colony district and the departments of Monclova and Bexar were geographical divisions of the State, established by the written law of the land and affecting political government, and they and their respective boundaries and the relative positions of these are judicially known, and so the boundaries of Zavala and Dimmit Counties and the relative positions of these and those of such departments and district are within the judicial knowledge of the courts, who also know that lands within these counties were embraced by such colony as well as by the limits of the department of Monclova, and that no part of said counties was within the department of Bexar, or those of the ancient province of Texas; and the power of attorney from one of the empresarios to the other, duly passed before a notary, conferring authority to act for the constituent empresario in carrying out the contract was properly attached to the testimonio of it, and both were proper to constitute part of the archive of the colony, its basis, and by law made transferable to and archives of the Land Office, and were competent as a document worthy of faith and credit to refresh the memory of the judge as to such matters so within the judicial knowledge of the court, and their admission in evidence was not error. Provisional Act, Pasch. Dig., p. 27;

Houston v. Perry, 5 Texas, 464, 465; Hatch v. Dunn, 11 Texas, 715; Robertson v. Teel, 9 Texas, 347, 348; Chadoin v. Magee, 20 Texas, 482; Williamson v. Simpson, 16 Texas, 438; Wheeler v. Moody, 9 Texas, 375; Rose v. The State, 24 Texas, 503; State v. Sais, 47 Texas, 642; Paschal v. Perez, 7 Texas, 357, 363; McGehee v. Dwyer, 22 Texas, 462, 463; Hamilton v. Avery, 20 Texas, 631; Wood v. Durrett, 28 Texas, 436; United States v. La Vengence, 3 Dall., 297; Peyroux v. Howard, 7 Pet., 242; Leyell v. Lapeer County, 6 McL., 446; White v. Burnley, 20 How., 246; 1 Greenl. on Ev., sec. 6.

3.   The commission of Soto was from the executive to a public officer appointed under the general public law to perform important duties and functions under such law relating to and affecting political government, and who was judicially known, and of whose archive it was a part, the basis relating to the land system of the State, and transferable by law to the Land Office of Texas, of which it became an archive; and it was not revoked, but was continued in full force by the laws of the former government, and it was competent evidence to show the appointment of such officer, to what departmental chief he was required to report for the performance of the duties imposed on such chief in his colony district, and that he was embraced by the description contained in the power conferred by the executive in the concessions, and the admission of this instrument was not error affecting any rights of the plaintiff.   Thrall's History of Texas, 18; 1 Yoakum's History of Texas; Prieto's History of Tamaulipas, 152; Jenkins v. Chambers, 9 Texas, 233, 234.

4.   It was competent to prove the issuance and existence of the express concessions of the executive by virtue of which the final titles were issued, to show authority for these and to show such final titles to be embraced by the remedial provisions of Decree 318 of May 16, 1835, as well as to show the equitable or primitive title from the State, to be followed by the final titles and proof of possession and payment of taxes, showing the claims to be embraced by the remedial provisions of articles 13 and 14 of the State Constitution, and fully excluded from the class affected by the penalties and restrictions of said article 13; and the original testimonios of such concessions under the great seal of the State, and admitted to be "true and genuine," were the primary and best evidence of their issuance and existence, and their admission over the plaintiff's objection was not error.   Decree 314, Laws Coahuila and Texas, pp. 303, 304; McGehee v. Dwyer, 22 Texas, 458, 459, 461–63; Hanrick v. Jackson, 55 Texas, 27, 30.

5.   Under Decree 190 the purchaser was not required to get a final title in fee to the land until he had performed all of the conditions and requirements, for which he was allowed four years, but he was required "to enter in possession of the land acquired" within eighteen months, six months before the second payment became due, and then had no

·other muniment to authorize a survey or his occupation of the land than his concession or primitive title, which must have remained in his custody; and when after performance of the conditions he obtained his final title in fee from the proper officer he was the proper custodian of both testimonios, which came from the proper custody when produced by those owning the lands by regular chain of transfers from him; and it is judicially known that lands in Dimmit and Zavala counties west of the Nueces River and on the east margin of this river above the Rio Grande and Bexar road were in the department of Monclova. Arts. 13 and 16, Decree 190, Laws Coahuila and Texas, pp. 190, 191.

6. Decree 272, of March 26, 1834, repealed Decree 190, and revived and required all such contracts and concessions theretofore made to be fulfilled under Decree 16 of the twenty-fourth of March, 1825, which contained no limitation upon the time of entering in possession or of making payment, performing conditions, and obtaining final title in fee; and it was competent for the proper officer at any time after the twenty-sixth of March, 1834, upon it being made to appear to him that the conditions of the law had been complied with, to issue the final title in fee to a purchaser upon such concessions, and he will be presumed to have done his duty according to law. Arts. 29, 30 and 7, Decree 272, Laws Coahuila and Texas, pp. 248–251; Hancock v. McKinney, 7 Texas, 451, 452; Jenkins v. Chambers, 9 Texas, 233–235; De Cordova v. City of Galveston, 5 Texas, 478–480; 1 Kent's Com., 465; Sedg. on Stat. and Const. Law, 2 ed., 116; Escreche Verbo Interpretacion de Leyes, 11, tit. 2, lib. 3, Novisima Rec.; Decree 309, Laws Coahuila and Texas, p. 397.

7. The terms of article 30 of Decree 272 are general, embracing all such contracts hitherto made without distinguishing between barred and not barred, and the courts can not introduce an exception where the Legislature made none, and the exception as to the right to make new contracts under Decree 16 proves it to be revived for all other purposes. Escreche Verbo Interpretacion de Leyes; Trueheart v. Babcock, 51 Texas, 169; Westrape v. Chambers, 51 Texas, 179; Summers v. Davis, 49 Texas, 541; McArthur's Heirs v. Dunn's Heirs, 7 How., 271.

8. The Congress of the State had the exclusive power to interpret the laws, and its interpretation of Decree 272, as expressed in Decree 314, shows that article 30 of the former embraced such concessions and required them to be fulfilled according to Decree 16, and this authoritative interpretation is binding upon the courts of the country. Arts. 1, 3, 4, Decree 314, Laws of Coahuila and Texas, pp. 303, 304; Const. 1827, art. 97.

9. As circumstanced these titles were not affected as to the right of being registered by section 4 of article 13 of the Constitution of the State of Texas, but they were still permitted and required by law to be recorded when proven according to law; their validity did not depend upon their

protocols being deposited in the Land Office; they recite full and sufficient consideration for their issuance, and required no other receipt upon them; they are not embraced by the circumstances prescribed by the thirteenth article of the Constitution to make titles subject to its restrictions and penalties, but they are embraced by the remedial provisions of this article and those of article 14; they describe by date, quantity of land granted, and the parties thereto, the very executive decrees of concession, which were such contracts as were at their date authorized by law to be celebrated with the executive by Mexicans, and such as authorized the issuance of such final titles in fee after performance of all the conditions; and their want of stamped paper is fully supplied by the attached admissions and agreements, which are in lieu of everything defendants might be supposed to be able to prove touching their execution and genuineness; they describe the lands by metes and bounds with certainty, and were proved to embrace the same land described in plaintiff's petition; and with such proof of their execution and long possession of the lands under them, they were relevant and competent to be admitted as full proof. Rev. Stats., arts. 4305, 4317; Const. 1875, secs. 2, 3, 4, art. 13; Art. 13, Decree 190, Laws Coahuila and Texas, p. 190; Art. 24, Decree 16, Laws Coahuila and Texas, p. 19; Jones v. Montes, 15 Texas, 351, 352; Strippelmann v. Clark, 11 Texas, 298, 299; Lee v. Wharton, 11 Texas, 61; Paschal v. Perez, 7 Texas, 348; Herndon v. Casiano, 7 Texas, 322; Houston v. Perry, 5 Texas, 462; Smith v. Townsend, Dall., 572.

10. There was no law requiring the concessions to be set out *totidem verbis* in the final titles which refer to and describe them with sufficient certainty as the authority for extending such titles, and the issuance and existence of such concessions to constitute such authority was fully established. These titles were signed by and they and the judicial possession delivered to Beales, the impresario of the colony, as attorney in fact of the grantees, excluding any want of consent on his part, and had there been such want it was fully cured by Decree 314. They contain the field notes of the land showing the survey was made by Eagerton, the surveyor, and apt words in every respect to express a grant in fee from the State; and such grant was then authorized by law to be issued upon such concessions when the purchaser had performed all the conditions and requirements of the law. Decree 314, Laws Coahuila and Texas, pp. 303, 304; Jenkins v. Chambers, 9 Texas, 180, 230, 232, 233; Hanrick v. Jackson, 55 Texas, 27, 30; McGehee v. Dwyer, 22 Texas, 461, 438, 439.

11. The commissioner, Soto, was duly appointed to his office pursuant to a general public law; he was known to the courts, and his commission shown; and his office and the entire colony contract under which he held it were continued in full force and effect and required to be performed and fulfilled in strict accordance with Decree 16 of March 24, 1825, which was revived by the reference thereto; and the repeal of

Decree 190, made in Decree 272 of March 26, 1834, and his acts as to lands within the boundaries of such colony, calling it by a name he or the empresario had given to it, instead of by the names of the empresarios, are valid and passed the title of the State, even if the lands were in territory common to his and another colony, without his claiming to be commissioner of such other colony, and the presumption is that he acted upon a subject within his jurisdiction. Jenkins v. Chambers, 9 Texas, 233; Williamson v. Simpson, 16 Texas, 437–39; Howard v. Richeson, 13 Texas, 553; Martin v. Parker, 26 Texas, 253; 2 Kennedy's History of Texas, 47.

12. When Decree 190 was repealed by Decree 272 of March 26, 1834, the concessions were not barred, and they were then placed under Decree 16 of March 24, 1825, which contained no limitation. But Decree 190 did not require the final title in fee to be issued or obtained within eighteen months from the acquisition of the concession; it only required the purchaser "to enter in possession of the land acquired" within that time, which he might have done and had it surveyed as soon as the concession issued, and it will be presumed that this was done in due time as one of the requirements of the law, all of which are shown by the final titles to have been already performed when they issued. These title are in sufficient manner and form, without any fatal violations of the Mexican vernacular or its domestic grammar or any such awkwardness of construction as to render them unintelligible, or any such diversity of style as to render them inoperative, and do not contain any such unaccustomed clauses as would require the expression of special reasons for their being therein contained; and the admissions attached to them repel every presumption of their want of genuineness that could possibly have arisen from any such defects, if they had contained them. De Cordova v. City of Galveston, 4 Texas, 477, 478, 480; Arts. 29, 30, Decree 272, Laws Coahuila and Texas, p. 251; Strippelmann v. Clark, 11 Texas, 298; Cox v. Giddings, 9 Texas, 47.

13. The registration offices contemplated by Decree 272 were never established in any part of the State, and article 24 of this decree only attached the "penalty of forfeiting the right, should the lands be granted to other persons for want of this knowledge," to be given by such registration. But these titles were all recorded in the proper counties and the lands were notoriously occupied under them when plaintiff made his files. They show upon their face that they were issued after full performance of all the conditions of the law, and that no further receipt or act of the government or its officers were requisite to their validity. They were not subjected to any penalty for not being presented to the commissioners appointed under the acts of 1850 and 1854, and required no confirmation. They were brought forward in 1845 and delineated upon the official maps and have remained so ever since, and were then

deposited in the General Land Office, where they remained till April, 1875. They were carried into the official abstracts of land titles in 1852 and have been shown there ever since, and junior titles or patents have been canceled by reason of conflict with them. Hancock v. McKinney, 7 Texas, 454; McMullen v. Hodge, 5 Texas, 78, 79; Hardy v. De Leon, 5 Texas, 233, 234.

14. These titles do not conceal any fact relating to the premises, but state the precise locality and description of the lands they include, showing them to be embraced by the colony of which Soto was commissioner, calling it by the name given it by the empresario or commissioner without the use of any falsehood, and they are not tainted with any subreption or obreption, and the colonization law of March 24, 1825, under which such concessions or contracts were then required to be carried out, permitted such final titles to be issued and judicial possession given to an attorney in fact, unaffected by article 12 of Decree 272, which applied only to sales made under this decree.

15. Effect must be given to each of the terms used in the Constitution and statute to specify the particular circumstances required by the right to locate, survey, or patent a tract of land by virtue of a certificate, and the absence of either of these circumstances will prevent this right from attaching to the particular tract; and the term "vacant," as used in the Constitution and the Revised Statutes, has a legal and technical meaning different from and was so used to add its import to that of "unappropriated," and it was incumbent upon the plaintiff to prove that the land was "vacant" as well as that it was "unappropriated" public domain when it made its locations, and without such fact being established it could not recover a judgment granting the writ of mandamus. Cool. on Const. Lim., 78; Bouv. Law Dic., "Vacant;" Sedg. on Stat. and Const. Law, 121, 124, 309; 1 Kent's Com., 426; Asberry v. Beavers, 6 Texas, 473, 474; Bracken v. Wells, 3 Texas, 90, 91, 92; Commissioners v. Smith, 5 Texas, 482, 484.

16. "A clear idea is to be had of the law as it existed before and of the mischief which it was meant to prevent" to ascertain the remedy intended to be given by the change in constitutional and statutory provisions on the subject of locations and surveys of certificates, and it appears that the law aforetime provided for the grant, issuance, location, survey, and patent of certificates without the use of the term vacant, and allowed suits to try title and eject occupants to be maintained upon locations without survey; and the multiplicity of such suits against and and their expense and annoyance to occupants of lands constituted the mischief intended to be prevented, and the protection of the occupants in the possession of their homes against such mischief was the remedy intended to be given by the change, which requires the land to be vacant and survey to be actually made, and denies the right to maintain any

action to eject or try the title upon a mere location; and these changes in the constitutional and statutory provisions are to be "construed largely and beneficially, so as to suppress the mischief and advance the remedy." Sedg. on Stat. and Const. Law, 218, 221, 224, 309; 1 Kent's Com., 426; Pasch. Dig., arts. 4040, 4053, 4057, 4059–65, 4150, 4167, 4437, 4050, 4075, 4080, 4153, 4159, 4170, 4172, 4179, 4226, 4437, 4204, 4238, 4286, 4287, 4308–4312, 4314, 4315, 4037, 4065, 4073, 4210, 4526, 5303; Wyllie v. Wynne, 26 Texas, 45, 46; Const. 1836, sec. 10, Gen. Pro.; Const. 1845, sec. 4, art. 11; Const. 1869, art. 10; Const. 1875, sec. 2, art. 14; Rev. Stats., arts. 3977, 3936, 3951, 4795.

17. The whole of the Constitution touching the subject must be construed together and if possible effect given to the whole and to every section and clause, and the courts must lean in favor of a construction which will render every word operative rather than one which may make some words idle and nugatory. And this rule should be applied with special force to written constitutions, and the courts should give to the word "vacant" as used in the Constitution its legal import and effect, excluding the location and survey of a certificate for a corporation upon land in the exclusive and adverse possession and actual occupation of an individual, whatever may be the character or nature of his claim or title, leaving it to the State alone as the lord paramount by a direct action to question his right of possession. Cool. on Const. Lim., 70, 71; Const., 1875, sec. 2., art. 14.

18. The objection to the grants on the ground of want of power in the officer who issued them is met by the rule "that the public acts of public officers purporting to be exercised in an official capacity and by public authority shall not be presumed to be usurped, but that a legitimate authority had been previously given or subsequently ratified," and in such cases "the presumption arising from the grant itself makes it prima facie evidence of the power of the officer making it, and throws the burden of proof on the party denying it;" and the purchaser from the grantee is not bound to go behind the grant to discover an equity in a third party or in the State, to be subsequently claimed by an individual, or to find out irregularities, but he is protected by the presumption that public officers do their duty; and when the titles were introduced the facts recited therein were evidence of the consideration upon which they were founded, and they and the regular chain of title, by perfect warranty deeds duly recorded from the grantees to the defendants, with such long continued occupation of the lands thereunder, payment of taxes thereon, and performance of all the duties of owners in fee thereof to the government, in connection with the constitutional provisions of the present and remedial or confirmatory act of the former government embracing them, rendered it certain "that the lands filed upon by plaintiff," which are the same they include, "are not vacant and unappropriated public domain, but

that they are titled lands, legally and equitably owned by the defendants, and are and ever since 1871 have been in the actual occupancy of the defendants   *   *   *   and those under whom they hold, they claiming by transfer and conveyances from and under the sovereignty of the soil, and that the appropriation thereof is evidenced as required by law." United States v. Peralta, 19 How., 343; Lea v. Copper Co., 21 How., 120; Bagdell v. Broderick, 13 Pet., 448; Marshall v. Brooks, 8 How., 223; Hancock v. McKinney, 7 Texas, 442, 443; Const., 1875, arts. 13, 14.

19.   Had these grants been issued by the government or State through fraud the plaintiff could not raise the objection in a trial of the title in an action of ejectment or trespass to try title, much less in these actions for mandamus, but it is a question exclusively between the sovereignty making the grant and the grantee; and if plaintiff had proved facts constituting mistake or inadvertence in the commissioner or false suggestions amounting to fraud, still it would not have been entitled to have these grants vacated or declared void in action brought by it on a junior claim of right, whatever might be the form of such action.   Hughes v. United States, 4 Wall., 232; Field v. Seabury, 19 How., 323; Wate v. Greenlee, 2 Murphy, 281; Crow v. Holland, 4 Dev. Law, 417; Waugh v. Richardson, 8 Ire., 470; Terrell v. Manning, 2 Murphy, 375.

20.   The writ of mandamus will in no case be allowed or granted against the surveyor unless it is clearly shown to be his legal duty to perform the act and that the party asking it has a clear right to its performance.   Commissioner v. Smith, 5 Texas, 478, 479, and cases cited, and 480, 483–6; Puckett v. White, 22 Texas, 563, 564; Cullem v. Latimer, 4 Texas, 331, 332; Glasscock v. Commissioner, 3 Texas, 51; Bracken v. Wells, 3 Texas, 88; House & Co. v. Collins, 42 Texas, 486; Guilbeau v. Mayes, 15 Texas, 417; Byrne v. Fagan, 16 Texas, 399; Tapp. on Mand., 410; Moses on Mand., 202, 203, 214; Tabor v. Commissioner, 29 Texas, 521; Kuechler v. Wright, 40 Texas, 607; Watkins v. Kerchain, 10 Texas, 375; Smith v. Power, 2 Texas, 57; United States v. Commissioner, 5 Wall., 565; Reg. v. Heathcote, 16 Mod. R., 51; 1 Chit. Gen. Prac., 791.


STAYTON, CHIEF JUSTICE.—This action was brought by appellant to compel the surveyor to survey certain lands located by it by virtue of genuine land certificates of which it was the owner.

Persons claiming the lands covered by the locations were with the surveyor made defendants, and no question is made as to the right of appellant to have the surveys made and field notes returned to the General Land Office if the lands were vacant and unappropriated public domain.

The locations were made on and subsequent to January 27, 1882.

The defendants who claim the lands allege that all the lands located by appellant cover all or parts of four eleven league rants made by the

State of Coahuila and Texas on April 18, 1834, to Francisco Pereya, Narcisso, Antonio, and Pedro Aguirre.

The land claimed through grant to Francisco Pereya is in part in Zavala County and in part in Dimmit County and on the western margin of the Nueces River, while that claimed under grant to Pedro Aguirre is entirely in Zavala County and on the west margin of the same river.

The two grants claimed to have been made to Narcisso and Antonio Aguirre are on the east side of the Nueces River, the latter in Zavala and the former in that and Dimmit counties.

The defendants are admitted to deraign title to these several grants, but the validity of the grants now or at any former period is denied by appellant.

The controversy in the court below was as to the existence of these grants and their validity, and the questions presented arise upon rulings of the court below on the admission of testimony and upon the findings upon the evidence admitted.

Appellees introduced in evidence a report made by the Secretary of State for the State of Coahuila and Texas to the political chief of Bexar, of date January 2, 1833, giving a statement of a number of colonial contracts made under decrees of March 24, 1825, and April 28, 1832, among which was stated to be a contract with Diego Grant and Juan Carlos Beales for the introduction of eight hundred families.

They also offered another report of same date made by the same officer to the same political chief showing a large number of concessions to purchase lands, among which were concessions to the persons before named under which they were each entitled to purchase eleven leagues of land.

The papers offered were thus certified by the Spanish translator and Commissioner of the General Land Office:

"STATE OF TEXAS, GENERAL LAND OFFICE,
"AUSTIN, October 20, 1883.

"I certify that the foregoing is a correct translation of two Spanish printed statements existing in the file of annual reports of colonization contracts and land grants by the executives, made by the Secretary of State of Coahuila and Texas to the political chief of Bexar, which file was transferred from the office of said political chief to the office of county clerk of Bexar County and thence to the General Land Office, and is now in existence in file 52 of the Spanish archives of this office."

This evidence was objected to on the sole ground that it was irrelevant. Those papers were not irrelevant, but tended to show that the concessions through which appellees claim were made, and made before the dates these reports bear date, and further that the colonization contract with Grant and Beales was in existence when the reports were made.

Taken in connection with the laws then in force they further tended to show that the colony as well as the lands in controversy were to some

extent within the territory over which the political chief of the department of Bexar exercised jurisdiction.

Appellees next offered in evidence a copy certified from the General Land Office of what purported to be the application of Grant and Beales for a colonization contract, of date October 5, 1832, and in connection with this a copy of the colonization contract certified in the same manner and bearing date October 9, 1832.

The application was made to the Governor of the State, and so much of it as has bearing on the questions raised in this case is as follows:

"*Most Excellant Sir:*   Diego Grant, a citizen of the State and naturalized in the Republic, and Juan Carlos Beales, a native of England and married to a Mexican woman, with children born in the country, with the greatest respect would represent to your excellency:

"That whereas the colonization law of April last passed invited all classes of persons, whether national or alien, to project subject to said law the settlement of the vacant lands of the State, the undersigned have determined to introduce into the department of Bexar eight hundred honest industrious families from Europe, thus contributing to the fulfillment of the object of said law, and to converting into settlements useful to the State and Mexican nation the vacant and desert lands which in their present condition can be of no advantage whatsoever.   In these terms and with the object of complying with the federal and particular laws in this enterprise to which we intend to devote ourselves, your excellency is requested to concede to us for the establishment of the families aforesaid the territory comprised within the following boundaries:

"Taking the line reputed as the dividing line of this State and that of Tamaulipas between the Rio Grande and Nueces River, and following the left bank of the Rio Bravo up to the twenty-fourth degree west of Washington, thence up the said meridian to intersect the twenty-ninth of latitude and following the same to the Nueces River, thence a line shall be run following downward the right bank of said river to intersect the line where the beginning was made.   *   *   *

"And whereas the territory comprised within these lines can suffice only for settling less than three hundred families, it becomes necessary that your excellency be pleased to annex to this concession the lands of Juan Lucio Woodbury's contract remaining surplus after those to which the two hundred families for whom he did contract are entitled shall have been computed or allotted, and to declare that if the said empresario, or his heirs because he is dead, should fail to introduce the families referred to within the term of two years to which he is still entitled, it is understood in that case that all the territory in said Woodbury's contract is from this date annexed to the territory which we have demarcated for settling in it the remaining five hundred and odd families."

The contract for colonization granted to the applicants the right to

colonize land between the Nueces and Rio Grande, reaching from the northern boundary of the State of Tamaulipas to the twenty-ninth degree of latitude, and it provided, "If within the time lawfully allowed to Woodbury and Vilen for the introduction of families as aforesaid they should fail to effect it, the whole territory which was ascribed to them shall *thenceforth* remain in favor of the actual empresarios."

The contract also sets out the boundaries of the Woodbury colony, the western line of which from the southern boundary of Cameron's colony followed the 100 degree of longitude to its intersection with the old road leading from Rio Grande to Bexar, and thence with that road to the Medina River, was a part of the southern boundary of the Woodbury colony.

The contract with Woodbury was made November 14, 1826, and would have terminated November 14, 1832, but for an extension of two years given by decree of Congress of date February 12, 1829. Decree 78; Laws Coahuila and Texas, 114.

The application of the colonial contract and the contract on file in the General Land Office are one paper, the conclusion and certificate to which is as follows:

"Before me, the secretary of the office of the Supreme Government of the State, and for due authority they did sign hereto, his excellency ordering that a testimonio of the document be delivered to the said Grant and Beales, to serve them as a muniment and title in due form, the original remaining archives in the secretary's office in my charge for due effects.

"City of Leona Vicario, the 9th of October, 1832.

                                ·"RAFAEL ECA Y MUSQUIZ,
                                "DIEGO GRANT,
                                ·"JUAN CARLOS BEALES.

"SANTIAGO DEL VALLE, Secretary.

"This is a copy of the original existing in the archives of the secretary's office in my charge, from which it was caused to be transcribed by the order of his excellency the Governor.

"Leona Vicario, on the 18th day of the month of· October, 1832.

                                "SANTIAGO DEL VALLE, Secretary."

The instrument was written on paper bearing stamp for the proper year. These papers were filed in the General Land Office on December 30, 1845, and their admission in evidence was objected to on the following grounds:

"1.   The same was incompetent as evidence and irrelevant to the issues in the case.

"2.   The same purports to be a copy from an unauthorized notarial copy, and as such is incompetent as evidence.

"3.   The lands in question in this case are not shown to be within

the boundaries of the colony for which this document purports to be a contract.

"4.    That it purports to be a colonization contract for the introduction of families in the department of Bexar, while it appears from the records in these causes that the defendants claim title under concession in sale authorizing the purchase of lands in the department of Monclova, and that hence the document offered is irrelevant."

The titles under which appellees claim purport to have been issued by the commission appointed to extend titles in a colony, and if the person who so acted was the commissioner for a colony in which any of the lands were situated then the evidence was not irrelevant, as will be more fully seen when we come to consider the concessions, final titles, and commission of the officer who extended the titles and gave juridical possession.

The second objection is not sustained by the record, for the papers offered appear to be the original testimonio of application for and grant of a colonial contract, duly certified by the officer who was the legal custodian of the protocol and delivered to the empresarios as the evidence of their right.

The protocol is now an archive in a foreign government, and such evidence as was offered in this case was the very best evidence of the colonial contract which could be obtained and filed in the General Land Office.

Such papers as were offered have been considered as properly pertaining to the archives of the respective colonies, and so were properly filed in the General Land Office, and no case can be found in which it has been held that a copy certified from that office was not admissible in evidence.

The question arose in Houston v. Perry, 3 Texas, 393, and it was said: "The presumption of law is that the document in the Land Office is not a second or third copy of the protocol remaining in the archives of the government of the State of Coahuila and Texas, but is the original copy or testimonio issued to the empresarios at the time of the execution of the contract.    Various provisions of the law requiring empresarios, under severe penalties on refusal, to deliver to the Commissioner of the General Land Office all documents in relation to land titles which had been and were considered archives (Laws of 1837, p. 44), and the contract of the empresarios being an essential constituent of the archives of a colony, it is but a reasonable inference that this paper was deposited in compliance with the requisitions of the law.    The commission was under no legal obligation to receive any other document in evidence of the contract between the State and the empresarios than the one forming a portion of the archives of the land titles of the colony, and the translation offered must prima facie be presumed to be a copy of the document thus legally received.    The translation is admissible only on the supposition that the original document could be offered in evidence without proof of its execution."

In the same case, on a second appeal, a certified copy of a colonial contract, as well as the paper in the General Land Office from which it was taken, were received in evidence, and the ruling was sustained. Houston v. Perry, 5 Texas, 463.

In Hatch v. Dunn, 11 Texas, 713, such evidence of a colonial contract, as was admitted in this case was held to have been properly received.

The following cases have bearing on the question: Bissell v. Haynes, 9 Texas, 556; Robertson v. Teal, 9 Texas, 344; Paschal v. Perez, 7 Texas, 356, 360; Herndon v. Casiano, 7 Texas, 322.

In some of the cases referred to it is declared that the courts have judicial knowledge of colonial contracts, and in Paschal v. Perez it was held to be unimportant in whose possession a paper properly an archive or record of some former office may have been before it was deposited in the General Land Office.

Some of the lands in controversy were shown to be within the boundary of the Grant and Beales colony, and that all may not have been was no reason for excluding the evidence, the relevancy of which will be considered in another connection.

The fourth objection is not sustained by the record, for while it applied for permission to purchase each eleven leagues of land in the department of Monclova the concession was for that quantity of land to each "at the place he may designate."

The concession was broader than the application, and of the power of the Governor so to make it there can be no question.

The applications to purchase were all made on the same day, and were in the same form, as were the concessions to each.

Those made by and to Narcisso and Antonio Aguirre were as follows:

"*Most Excellent Sir:*—The citizens Narcisso and Antonio Aguirre, brothers, before your excellency respectfully represent that the colonization law permitting that Mexicans may acqire vacant lands of the State by title of purchase, your petitioners in conformity with that law humbly supplicate your excellency to be pleased to concede to them in sale to each of them eleven leagues of the vacant lands in the department of Monclova, with the right to unite them in one body or separate them in divers fractions, as may seem to them most convenient, obligating themselves as they do to pay at once the fourth part of its value, and to pay the balance in the terms the law prescribes, and complying also by the introduction of the number of sheep and cattle upon said leagues conforming in every particular to what is provided in the said colonization law; wherefore, they supplicate your excellency to be pleased to provide accordingly, whereby we will receive grace and justice.

"Narcisso Aguirre,
"Antonio Aguirre.

"Leona Vicario, October 12, 1832."

"LEONA VICARIO, October 16, 1832.

"In accordance with article 13 of the new colonization law passed by the honorable Congress of the State on the 28th of April, 1832, I grant in sale to each of the petitioners the eleven leagues of land which he solicits at the place he may designate, provided the tract of each shall be united, and that it does not by any title belong to any corporation or person.

"The commissioner for the distribution of lands in the colony to which those which the petitioners shall solicit may correspond, and in defect of such commissioner or the same not being embraced within any colony, the first or only alcalde of the respective or most immediate municipality complying with the provisions made touching the matter, will put them in possession of said leagues, and will issue the corresponding title after classifying the quality of them for the designation of what they ought to pay to the State, which payment must necessarily be made by the interested parties, in the manner and on the terms which the latter part of said article 13 provides, making the cash payment required by this article at once to the treasury of the State, evidence whereof they shall present in order that in view thereof the secretary's department may proceed to give each one of the interested parties a copy of this decree, so that by his appearing therewith before the commissioner it may produce the corresponding effect.

"ECA Y MUSQUIZ,
"SANTIAGO DEL VALLE.

"('Satisfa' underscored is not valid.) It is a copy of its original which exists in the archives of the State Department under my charge, from which it was ordered to be taken by the decree of his excellency the Governor.

"SANTIAGO DEL VALLE, Secretary.

"Leona Vicario, October 17th, 1832."

The parties made a written agreement in reference to each of the applications and concessions involved in this case for use on the trial, in which it was agreed that each bore the "true and genuine signature, in his official capacity, of Santiago del Valle;" that the seal at the top of each of said instruments (omitted in statement above, as is the stamp, but shown in the record) "is a true and genuine impress of the great seal of the State of Coahuila and Texas which was in use at the time of the purported execution of said instrument; that the paper stamp also upon the paper upon which said document is written was the legal stamp used by the State of Coahuila and Texas for the purposes for which it was used in this instrument during the years 1832 and 1833."

It will be observed that these papers appear to be the original testimonios delivered to the parties as evidence of their rights each to purchase

eleven leagues of land, and they came from the possession of persons claiming through them, and were objected to on the following grounds:

"1. Said documents are irrelevant to the issue in this cause, and do not tend to prove title to any of the lands in controversy herein.

"2. Said documents purport to be testimonios of concessions authorizing the purchase of lands in the department of Monclova, and are not therefere competent as evidence tending to prove titles to lands situated in what was then known as the department of Bexar.

"3. Said documents do not come from the proper custody.

"4. If said documents ever had validity they were but imperfect and inchoate titles, purporting only to grant the right to select land for purchase, and as such are not competent as evidence tending to prove title to any particular land.

"5. Said documents and all rights and privileges thereunder became and were forfeited by the terms and conditions of the law under which they purport to have been issued before any proprietary rights had been acquired thereunder."

The first step in the acquisition of lands by purchase was an application to the Governor for a concession, which when granted was the foundation of the right in the particular instance. The concession ordinarily provided by whom the final title should be issued, and in most cases this was directed to be done as directed in the concessions before us. While the concessions did not give to each of the applicants title to any land, they did give to each the consent of the government that they might buy, and this was essential to the acquisition of such grants by purchase. This was a fact necessary to be shown, and evidence establishing or tending to establish it was not irrelevant. They were further relevant for the purpose of showing what officer or person was thereby given power to extend the final title and do all other acts necessary to that end.

The second objection has been considered in another connection and will be further considered hereafter.

The concessions delivered to the several parties ought perhaps to have been attached to the protocols which remained in the archives of the government then existing, but looking to the papers offered as final titles the inference is that the officer who issued them deemed it unnecessary to do this, and thought it sufficient to recite in the titles themselves his authority for his act. This would seem to be sufficient, for the protocols of the original concessions must be presumed to be in the proper archives.

The genuineness of the concessions being conceded, that they came from the custody of persons claiming through them is no sufficient reason for their exclusion, though the usual practice may have been to attach them to the protocol of final title which remained in the proper archive.

The fifth objection to the introduction of these papers will be considered in another connection.

Appellees offered in evidence the following instrument:

"The alien Don Carlos Beales having on the fifth instant applied to this government for the appointment of a commissioner to give possession of lands in the colony for which he has contracted jointly with Don Diego Grant, I have deemed it proper to commission you for the indicated objects, and in accordance to the instructions issued for this class of commissioners by the honorable Congress on the fourth day of September, 1827, a copy of which I enclose herewith, to proceed to the distribution of the lands to which the families contracted for on the ninth of October, 1832, by said Beales and his partner are entitled, a testimonio of which contract shall be placed in your hands by the empresario; it is understood that you must previously inform of this commission the political chief of the department of this capital, for his knowledge, and in order that he may comply with the provisions of article 7 of Decree No. 128, a copy of which I enclose herewith; also one of Decree No. 62, which are referred to at the close of said instructions.

"God and Liberty.   Monclova, the 13th of March, 1834.

"FRANCISCO VIDAURRI Y VILLARENOR.

"J. MIGUEL FALCON, Secretary.

"To Señor Don Fortunato Soto."

It has the proper certificate of the translator and Commissioner of the General Land Office attached, stating that it is a correct translation of an official document in the Spanish language, existing in file 43 of Spanish archives of that office; but there is no statement when or by whom it was filed, and the original is represented to have been under the "seal of the Supreme Government of the free State of Coahuila and Texas."

The genuineness of this instrument is not questioned, but its admission in evidence was objected to on the following grounds:

"1.   The same does not purport to confer upon the commissioner authority to extend titles of the character under which defendants claim.

"2.   Said commission purports only to confer authority upon the commissioner to distribute the lands to which the families contracted for on the 9th of October, 1832, by Don Carlos Beales and Diego Grant were entitled, which said colony was, according to proof already introduced by defendants, situated in the department of Bexar, while it appears from the record in the cause that defendants claim title under a concession in sale authorizing the purchase of lands in the department of Monclova, wherefore, the document offered is not competent as evidence tending to prove the authority of the said commissioner in the premises.

"3.   Said instrument is not properly an archive of the General Land Office of the State of Texas.

"4. If said instrument ever had any validity it was revoked by law subsequent to its issuance, to-wit, on the 26th of March, 1834."

It is true that this commission does not in terms empower the commissioner to extend the titles involved in this controversy nor like titles, but the concessions do empower "the commission for the distribution of lands in the colony to which those which the petitions shall solicit may correspond, * * * to put them in possession of said leagues, and will issue the corresponding title," etc.

If the lands were within the territory allotted to Grant and Beales for colonization, and the commission named was the power appointed to extend titles to settlers thereon, then he had power to issue the titles in question unless his power was revoked by the law of March 26, 1834.

The seeming uncertainty raised by the evidence in this case as to whether the lands in controversy were then recognized to be in the department of Texas or the department of Monclova, and its bearing on the rights of the parties to this cause, will be considered elsewhere.

The instrument, the copy of which was offered in evidence, purports to be an original and not a copy delivered to the commissioner as the evidence of his official character, as was usual in all such matters, the original remaining with the government as an archive, and if a question were made as to its genuineness this fact might call for explanation.

As, however, no such question is raised we are not prepared to hold that a paper which would be a proper archive of a government now foreign, affecting as it does lands in Texas, is not legally archived in the General Land Office.

The fourth objection will be considered in another connection.

Appellees offered in evidence papers purporting to be final titles to the persons through whom they claim, all issued on the same day by the Commissioner Soto and alike in form, one of which is as follows:

"In the town of Dolores, State of Coahuila and Texas, on the 18th day of April, 1834, I, the citizen Fortunato Soto, as commissioner of the supreme government of the State, in the Rio Grande colony, by virtue of the contract celebrated between the said government and its citizen (Narcisso Aguirre), after compliance with all the other requirements and conditions which the laws provide on the subject, and in accordance with that which the governor ordains in his superior decree of the 16th October, 1832, contained in the contract aforesaid, do in the name of the government extend the present title to the citizen John Charles Beales, attorney in fact for the citizen (Narcisso Aguirre), whose power of attorney he has exhibited to me for the eleven leagues to which the aforesaid contract refers, which in their present condition I have classified as grazing land, and the limits whereof are as follows. [Here follows description.]

"And that in order that the property which the aforesaid citizen Narcisso Aguirre has in said eleven leagues of land might in all due form of

law always be evident and certain, I went with his attorney, the citizen John Charles Beales, and after the same had been surveyed by the surveyor, the citizen William Eagerton, put him in possession, and taking him by the right hand I perambulated the said eleven leagues of land with him in the name of the said government, and caused him to perform all the other ceremonies which the laws provide for this case of actual possession, omitting the citation of adjoining owners, there being none such.

"The citizens Victor Pepin, Edward Little, and George Colwell, being witnesses, in addition to those of my own assistants, all residents of this town, who for due formality signed with me and the interested party on the said day, month, and year.

"The party obligating himself to replace the paper of the seal which corresponds, there being none such now in this town nor its contiguities.

"FORTUNATO SOTO.

"Of assistance:

"THOMAS J. PLUCKNETT,

"JOHN CHARLES BEALES,

"GEORGE COLWELL,

"THOMAS H. F. O'S. ADDICKS,

"VICTOR PEPIN,

"EDWARD LITTLE.

"I, the citizen Fortunato Soto, commissioner of the supreme government of the State in the Rio Grande colony, do certify that the foregoing testimonio is a literal and true copy of and was legally taken from its original, to which I remit myself, and which is extant in the respective book of the archives of this colony, and in compliance with the eighth article of the instructions of the 25th of April, 1830, I give these presents to the interested party to serve him as his title, the same going on common paper, there being none of the corresponding seal in this town nor in its contiguities, and for its due authentication I have signed the same with assisting witnesses, the said day, month, and year.

"FORTUNATO SOTO.

"Of assistance:

"THOMAS H. F. O'S. ADDICKS,

"THOS. JAS. PLUCKNETT."

John Charles Beales held a power of attorney made by all the grantees and several others, of date October 18, 1832, which gave to him power to demand and receive the titles and to exercise in regard to them most extensive powers, irrevocable.

There was an agreement that the signatures to these papers "purporting to be testimonios of final title executed by Fortunato Soto, commissioner, on the 18th day of April, 1834, are the true and genuine signatures of the parties who signed the same," and that when introduced with the agreement "should be full and conclusive proof of all facts above stated,

and of no other fact, plaintiff expressly reserving any and all other objections to said instruments."

The instruments in Spanish, after having been proved for registration in a manner as to which no question is raised, were filed for record in the counties in which the lands are situated on June 22, 1878, and were recorded on June 24.

It was shown by the Commissioner of the General Land Office that the originals of the testimonios offered in evidence were not in that office, but it was made to appear that the testimonios were filed in that office in the year 1845 or 1846, and there remained until April 16, 1875, when they were withdrawn by C. R. Johns & Co., acting under power of attorney from John Charles Beales and the surviving children of his deceased wife. This power of attorney related to nine separate eleven league grants, including these in controversy, which the parties claimed, and from the power it seems had placed in the hands of Johns & Co. as early as 1867 for the purpose of having the title perfected or cleared. The lands were placed on the maps in the General Land Office as early as 1846, and on the maps in Bexar land district about the same time, and so remained until appellant made its locations.

It was shown from the records of the Comptroller's office that there was no evidence there that the lands had been assessed for taxes prior to the year 1871, since which time taxes were paid by C. R. Johns & Co., "trustees," or the defendants until 1882.

The grants were placed on the abstracts of titled lands printed in 1852 and 1878, but were not placed on abstracts published between those dates.

There were sixteen objections made to the admission of the papers purporting to be testimonios of title in the Spanish language, translations thereof being offered at the same time. Many of these objections have been considered in disposing of other questions raised, and others go to the forms and manner in which the titles are made up.

The form of the several testimonios is unusual in that they do not contain petitions to the commissioner for extension of final title with general designations of land desired, accompanied with the concessions, a reference to the empresarios, their consent, order for survey, report of survey, and other like things which are usual in such titles, but it can not be held for the want of such things that testimonios containing the essentials of final title ought to have been excluded.

The absence of those things might excite inquiry bearing on the genuineness of the papers and the time and circumstance of their execution, but the genuineness of the signatures to them is admitted, and such other inquiries as might thus be raised do not go to their admissibility in evidence.

They are shown to have been in existence more than forty years, and coming from the custody in which they are shown to have been ought to

be received in evidence as ancient instruments unless suspicion other than such as may arise from their form be cast upon them if there be no other reason requiring their rejection.

It was urged, as the originals were never filed in the General Land Office, nor the testimonios proved for record and registered in the county in which the lands were situated prior to the adoption of the present Constitution, that the Constitution forbids their use in evidence, and that if ever valid they were stale and forfeited, "and the land to which they relate was remitted to the public domain by legislation equivalent for reversion by office found."

The present Constitution of this State became operative on the third Tuesday in April, 1876, and article 13, section 4, of that instrument provides that "no claim of title or right to land which issued prior to the 13th day of November, 1835, which has not been duly recorded in the county where the land was situated at the time of such record, or which has not been duly archived in the General Land Office, shall ever hereafter be deposited in the General Land Office, or recorded in this State, or delineated on the maps, or used as evidence in any of the courts of this State, and the same are stale claims, but this shall not affect such rights or presumptions as arise from actual possession."

The record forbids the holding that the claims of title or right to land now asserted by appellees had been duly archived in the General Land Office prior to the time the Constitution took effect, as does it forbid the holding that their evidences of right had been recorded in any manner in any county in the State prior to that time, and the question arises whether effect can be given to this section of the Constitution in its entirety without violating the supreme law of the land.

It is doubtless within the power of the people of a State, through a constitutional provision or legislative act, to declare what evidences of right may or may not be archived in the General Land Office or recorded in the several counties, or to declare what notice of ownership of land may not be evidenced by delineations on public maps; for while such prohibitions may make it more difficult for persons owning lands, against which such provisions operate, to preserve and manifest their rights, they do not prevent such persons establishing their ownership in a court of justice under the ordinary rules of evidence applicable to the admission of that which originally conferred title and was given for the purpose of evidencing the right.

The declaration that "no claim of title or right to land which issued prior to the 13th day of November, 1835, * * * shall ever hereafter * * * be used as evidence in any of the courts of this State," unless it had been archived in the General Land Office or recorded in the county in which the land is situated at the time of record, could have applica-

tion only to such evidences of right as before that time could have been archived or recorded—to writings evidencing titles.

Its effect is to declare that unless the protocol—the only evidence of title to the land which under the laws in force at the time the Constitution became operative could be archived, unless it were an archive in some department of the former government—was then on file in the General Land Office, a testimonio, the instrument given to be used as evidence of individual right, however well proved up, could not be admitted in evidence unless it or a copy of the protocol certified from the General Land Office had been recorded.

The originals or protocols of the papers offered in evidence, if they ever existed, ought to be archives of a now foreign government, and from the evidence offered presumably are so; and appellees and those through whom they claim have had no means through which these could be removed and filed in the General Land Office, nor has this government at any time made any provision whereby copies of them, however authenticated, could be here duly archieved.

That the testimonio of a grant to an individual could not be legally archieved is well settled, and in consequence of this many persons anxious to preserve and notify all persons of their rights having filed such papers in the General Land Office, as did those through whom appellees claim, the Legislature authorized their withdrawal. Pasch. Dig., arts. 76, 77.

Prior to the adoption of the present Constitution failure to register evidence of titles to land did not render them inadmissible in evidence on proper proof of their execution, and the only effect of failure to register was to render them inoperative as to creditors and subsequent purchasers for valuable consideration without notice.

There is no question of notice in this case, for appellees were in actual possession at the time appellant made its locations.

The provision of the Constitution gave no time after its adoption within which parties might record their titles, but declares that such as were not recorded at that time should never be received in evidence unless the titles were then archived in the General Land Office.

The effect of this was to deny to the holders of such claims the right or power to exhibit their rights in due course of law. A right existing to-day and susceptible of proof under well established rules of evidence applicable to all persons—by the writing creating and by law required to be given as the evidence of the particular right—which in consequence of arbitrary legislation of to-morrow may not thus nor in any other manner be established in a court of justice, is practically a right destroyed.

The only means given by the section of the Constitution referred to to establish titles issued prior to November 13, 1835, not archived or recorded is through such presumptions as arise from actual possession,

and by that we understand that the title is not to be recognized unless the possession has been such and so long continued that a grant therefrom may be presumed under the rules applicable to that subject.

Prior to the adoption of the Constitution persons owning such grants had not been required to remain in possession of them as a condition on which the continuance of the right depended, and a law which makes some prior act of the party not necessary before its enactment the only evidence which can be admitted to prove a title valid at the time of its enactment would seem to be subject to all the objections that may be urged against retroactive legislation.

There being no law in force prior to the adoption of the present Constitution which enabled appellees or those through whom they claim to archive their titles, record them in the county in which the lands were situate, or to remain in actual possession, no right accrued to the State on account of their failure to do any of these things, and the declaration that for failure in any of these respects their claims became stale is but an arbitrary declaration of a result not following from a former law applied to facts existing at the time the Constitution became operative.

Notwithstanding all we have said is true, the declaration found in the Constitution that such titles shall not be "used as evidence in any of the courts of this State" must be given effect unless it contravenes some provision of the Constitution of the United States or other supreme law of the land.

The fourteenth amendment to the Constitution of the United States, among other things, provides: "Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Article 1, section 10, of the same instrument, provides, among other things, that "no State shall * * * pass any * * * law impairing the obligation of contracts."

If appellees have rights they arise on contracts made between the State of Coahuila and Texas and the several grantees through whom they claim, and their rights were never abrogated before Texas became a State of the Union.

If ever valid claims they were valid when the Constitution became operative, and to determine whether or not they were valid claims proof that the final titles were extended was necessary, and this could be established only by the written evidence of that fact or proof of the execution and contents of them, both of which methods are prohibited by the section of the Constitution referred to.

Legislation in whatever instrument found which forbids the introduction of evidence of a prior contract, admissible and made necessary to the validity and existence of the contract by the law in force at the time it

was made, unless it provides some other method of making sufficient proof of the necessary facts accessible to the person called upon to make the proof, it seems to us impairs the obligation of a contract as fully as though such subsequent law in terms declared that the contract should no longer be operative or be enforced through the courts, for it destroys the only means through which the contract may be established and enforced if effect be given to the enactment—in effect renders the contract inoperative; for without proof of its existence and terms a contract however valid can have no standing in a court of justice, the only tribunal through which contracts can be enforced in the absence of voluntary compliance by the parties thereto or by those claiming through them.

We are of opinion that the provision of the Constitution of this State under which it is claimed the evidence under consideration should have been excluded is in conflict with both of the provisions of the Constitution of the United States to which we have referred.

It is not shown that the lands in controversy, originally titled to Mexicans, did not belong to them on July 4, 1848, when the treaty of Guadaloupe-Hidalgo was proclaimed. If they did, then they are protected in so far as valid titles against the State of Coahuila and Texas on March 2, 1836.

The last paragraph of article 8 of that treaty provided that "in said territories (ceded territories) property of every kind now belonging to Mexicans not established there shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guarantees equally ample as if the same belonged to citizens of the United States."

The first paragraph of the same article secured to Mexicans established within the ceded territory the same rights.

The last paragraph of the second article, explanatory of the treaty signed on February 2, 1848, declared that "those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th day of May, 1846, and in Texas up to the 2d day of March, 1836, were within the protection of the treaty."

Article 6, section 2, of the Constitution of the United States declares that "this Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

If the court below, on inspection of the documents offered, could have held that they did not confer such title under the Mexican law against the State of Coahuila and Texas as was entitled to protection under the treaty, or that they conferred no title whatever, then they might properly

have been excluded; but if they showed title, even though subject to forfeiture for breach of condition, they were properly in so far admitted.

It is urged that the papers purporting to be final titles, in connection with the other evidence offered, did not show title to any of the land in controversy, and some of the grounds on which this assertion is based will be considered.

The concessions were made under Decree 190, of date April 28, 1832 (Laws Coahuila and Texas, p. 189), and it is claimed that the commission of Soto was annulled by Decree 272, of date March 26, 1834.

This proposition is based on articles 29 and 30 of the decree last named, which in terms repealed so much of all former instructions as were inconsistent with its provisions, and it declared that no further colonization contracts should be made, but that those theretofore made should be strictly fulfilled in accordance with the law of March 24, 1825.

Decree 272 contemplated a new system for the disposition of the public domain, but it never was inaugurated in Texas nor any commissioners appointed under it, except the commissioners Smythe and Taylor, who were appointed under the express provisions of article 32 of that decree, and might have been appointed without it.

The entire legislation of the period manifests no intention to divest rights acquired under Decrees 16 and 190.

The effect of Decree 272 upon rights acquired under Decree 16 was considered in Jenkins v. Chambers, 9 Texas, 234, in which the same propositions were asserted in reference to rights acquired under Decree 16 as are asserted in this case against rights claimed to have been acquired under Decree 190.

In that case it was said that "the instructions to commissioners were repealed only in so far as they were opposed to the provisions of the law of 1834. Decree 272, art. 29. Those of the 4th of September, 1827 (Laws and Decrees, p. 70), were doubtless mainly intended for the government of commissioners for the distribution of lands to colonists proper. But their terms are sufficiently comprehensive to embrace, and they were made to embrace, other cases of concessions made under the law of 1825. The reason of the law which required that colonization contracts should be carried out in accordance with the law of 1825 undoubtedly applied with equal force to the concessions in this case. The law did not in terms provide for extending titles to colonists introduced under these contracts, but it could never have been doubted that it was intended to include them; and there can be as little doubt that it was then the received construction of the law that the repeal did not divest the Governor of the authority to complete the titles when there had been concessions made to purchasers and settlers under the law of 1825. That construction seems more natural and rational than the opposite one, which would require us to suppose that the Legislature intended, indirectly and by implication,

to annul pre-existing rights and contracts guaranteed and confirmed by previous laws. We can not suppose that such consequences were intended, and the history of the times, it is believed, as connected with this subject, will afford abundant evidence that such was not understood to be the effect of the repealing law."

Many titles in this State would be uprooted if the law upon this subject was as contended for by appellant; and in view of the course pursued by the Governor of the State and other officials, who must be presumed to have understood their powers and in good faith acted upon them, nothing short of a law clearly showing a usupation of power would justify our holding that their acts were invalid. We therefore hold that the court did not err, in view of the other evidence in this case, in refusing to exclude the documents offered on the ground that the commission to Soto had been annulled before he issued the titles.

It is further urged that the documents should have been excluded because no proof was made that the conditions on which these grants were made were ever complied with; and further that the grants were extended to an attorney in fact, which it is claimed was forbidden by article 12, Decree 272. As to the last of these objections we are of opinion that the law referred to has no application to this case.

As to the first and to the further objection that the real intention of the parties was to procure for John Charles Beales a large number of eleven league grants in contravention of article 12, National Colonization Law, article 24, Decree 16, and article 13 of Decree 190, the inquiry arises whether appellant is in position to raise these questions or to question whether any of the lands were outside of the boundaries of Grant and Beales colony or within the department of Coahuila or Bexar.

Counsel for appellant proceed upon the theory that it is the holder of "junior title" or "color of title," which under article 13, sections 1 and 2 of the Constitution would make grounds for forfeiture enure to its benefit, and cast the burden of proving full compliance with all the conditions on which the grants were made on appellees.

Grounds for forfeiture for non-compliance with conditions may exist; it may have been the intent of the grantees and Beales to acquire for him more land than the law permitted to be held by one person, and that on this ground forfeiture might be claimed by the State or the holder of junior title or color of title; and it may be and doubtless is true that the commissioner issued title to lands not within the limits of the colony for which he was commissioner, and the grants in so far may be void; and it may be that the grants are situated within limits then recognized by the authorities to be in the department of Bexar, but it does not follow if all these things be true that any of them can enure to the benefit of appellant.

The concessions which conferred the right to purchase, if this record speaks the truth, were valid, and Soto had power to issue titles if the in-

strument evidencing his authority be not false; and however much he may have exceeded his authority, the lands are nevertheless, within the meaning of article 14, section 2 of the Constitution, "titled lands." True-hart v. Babcock, 51 Texas, 177; Northrope v. Chambers, 51 Texas, 187, Summers v. Davis, 49 Texas, 541; Winsor v. O'Connor, 69 Texas, 571, and cases therein cited.

The section of the Constitution referred to provides " that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the county records or in the General Land Office, or when the appropriation is evidenced by the occupation of the owner or some person holding for him."

This provision of the Constitution was construed in Winsor v. O'Connor and in other cases, and it can not be claimed that by the locations made by appellant in violation of law it acquired such rights as under article 13, sections 1 and 2 of the Constitution can be held to constitute " junior title " or " color of title."

A grant made by the State of Coahuila and Texas subsequently to the issuance of the titles under which appellees claim, or a patent from this State issued prior to the adoption of the present Constitution or subsequently under a location made before, would constitute " junior title," as would a location on valid land certificate made before the adoption of the Constitution constitute " color of title," which would entitle their holders to the benefit of the provisions of article 13, sections 1 and 2 of Constitution.

It is evident that it was not the purpose of that article of the Constitution to validate invalid Spanish or Mexican titles, but on the contrary to reserve every right the State had to annul them for failure to comply with conditions precedent or subsequent or for any other legal cause; and it is not believed that it was the purpose of Decree 314 to give validity to any grants wanting in the essential elements of valid title; but while this is so it does not better the condition of appellant, who shows neither " junior title " nor " color of title."

However defective the titles through which appellees claim may be, they show such facts as deprive appellant of the right to the writ of mandamus which it seeks.

There are many other incidental questions presented in the carefully prepared briefs of counsel, which in this opinion, already too much extended, we can not present; but those considered are decisive of the case before us, and the judgment of the court below will be affirmed.

*Affirmed.*

Delivered June 18, 1889.